**P. Wesley FOSTER, Jr., Plaintiff,**

v.

**UNITED STATES of America, General Services Administration, and District of Columbia, Defendants.**

**Civ. No. 95–722 (CRR).**

United States District Court, District of Columbia.

March 29, 1996.

Donald B. Mitchell, Jr., Lawrence E. Blatnik, Andrew C. Cooper, and Peder Magee, of Arent Fox Kintner Plotkin & Kahn, Washington, DC, for plaintiff.

Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, and Cannon M. Tolbert and Mary F. Edgar of the Environmental Defense Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant United States.

William T.K. Dolan, Office of Regional Counsel, General Services Administration, Washington, DC, and Gerald Kohns, United States Army Litigation Center, Arlington, VA, for defendant General Services Administration.

Charles F.C. Ruff, Corporation Counsel, Martin Grossman, Deputy Corporation Counsel, Civil Division, William J. Earl, Chief, Major Case Section, Civil Division, and Gail S. Miller, Assistant Corporation Counsel for the District of Columbia.

CHARLES R. RICHEY, District Judge.

Before the Court in the above-captioned case [1] are the parties' cross-motions for summary judgment. Upon careful consideration of the parties' pleadings, the entire record herein, and the law applicable thereto, the Court shall grant the defendants' Motions for Summary Judgment on the plaintiff's claims under the CERCLA for past costs he has incurred investigating contamination located at his property in Southwest Washington, D.C., and on the defendants' counter-claims against the plaintiff that he is liable under the CERCLA as a current owner of the property. The Court shall deny the plaintiff's and the defendants' Motions regarding the defendants' liability under the CERCLA for future response costs. Finally, the Court shall grant the defendants' Motions for Summary Judgment on the plaintiff's claims under RCRA.

## BACKGROUND [2]

The plaintiff, the sole general partner of Riverside Associates ("Riverside"), brings action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607, 9613, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B),

---

1. The plaintiff originally filed his Complaint on August 19, 1994. (Civil Action No. 94–1815 (CRR)). After the Court denied the District of Columbia's Motion to Dismiss, or in the alternative for Summary Judgment, on November 23, 1994, the parties stipulated to dismiss the action without prejudice. Accordingly, the Court dismissed the case without prejudice to the plaintiff reopening the matter by April 14, 1995. The plaintiff filed the above action on that date. He thereafter filed an amended Complaint adding his claims under the RCRA.

2. Except as otherwise noted, all facts are drawn from the parties' Joint Statement of Material Facts Not In Dispute, submitted in accordance with Rule 108(h) of the Rules of the United States District Court for the District of Columbia.

against the District of Columbia (the "District"), and the United States, seeking both declaratory and monetary relief with regard to the environmental contamination of property belonging to him in Southwest Washington, D.C. ("the Site"). The defendants, in turn, assert counterclaims against the plaintiff under the CERCLA. The District also asserts a cross-claim against the United States under the CERCLA.

Under the CERCLA, the plaintiff seeks to recover response costs incurred by him in connection with the investigation of contamination at the Site. The plaintiff also seeks prejudgment interest on such costs from the date of the Complaint, in accordance with 42 U.S.C. § 9607, as well as a declaratory judgment pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201 that the defendants are liable for all costs consistent with the National Contingency Plan, 40 C.F.R. Part 300.1 et seq., that may be incurred by the plaintiff as a result of releases or threatened releases of hazardous substances at, onto, and from the Site. The plaintiff also alleges that the defendants are liable under the RCRA as "person[s] ... who ha[ve] contributed ... to the ... handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" at the Site. 42 U.S.C. § 6972(a)(1)(B).

The Site consists of 7.98 acres of fill property; it sits, in part, on what used to be the James Creek Canal,[3] and is bounded on the east by the western boundary of Second Street, S.W., on the north by the northern boundary of Q Street, S.W., on the west by Fort Leslie J. McNair, and on the south by the northern boundary of S Street, S.W. The plaintiff claims that the defendants are former owners and/or operators, within the meaning of CERCLA, of the Site and its adjacent properties, whose actions dating back as early as the nineteenth century have contaminated the Site with lead, mercury,

polychlorinated biphenyls ("PCBs"), polynuclear aromatic hydrocarbons ("PAHs"), and total petroleum hydrocarbons ("TPHs"). The plaintiff alleges that the United States contaminated the Site by the operation of an arsenal at Fort McNair, the filling of the property with material containing lead, mercury, PAHs and petroleum substances,[4] and the disposal and release of PCBs from electrical transformers formerly located at the Site. He alleges that the District is liable for the contamination at the Site by virtue of its former operation of a sewage system that deposited allegedly hazardous substances into the Canal, its having sprayed the Canal with kerosene, and its role in filling the Canal.

The history of the Site and its surroundings is somewhat complex. As noted, a military reservation owned by the federal government is located directly west of the Site and currently comprises the entire western boundary thereof. That property was formerly known as the Washington Arsenal, the Washington Barracks, the Army War College, and Fort Humphries; it is currently known as Fort McNair. From the early nineteenth century until 1881, portions of the reservation were used as an arsenal for the manufacture and storage of artillery, small arms, and ammunition. While it is undisputed that the materials used to produce the artillery and ammunition included lead and mercury, there is no direct evidence in the record regarding the specific types of wastes produced by the manufacture of munitions at the reservation, nor is there any evidence in the record concerning the manner of disposal of such wastes.

The James Creek Canal, which itself constituted part of what is today the Site, was built from the James Creek in the mid to late 1870s. When it was in existence, the Canal separated the western edge of the Site from the eastern boundary of Fort McNair. In the early 1900s, pursuant to authorization by

---

3. The James Creek flowed in a northerly direction along the western edge of the Site; it emptied into the Anacostia River. The James Creek Canal, in turn, formed the western boundary of the Site and separated it from the eastern boundary of Fort McNair.

4. The United States denies that it owned the areas of the Site immediately adjacent to the Canal during the period prior to 1930 and that it arranged for the disposal of fill material in the canal and areas adjacent to the Canal. *Id.* ¶ 15.

Congress, the District leased wharf space along the Canal to private parties. During that period, the Canal also formed part of the District's sewage system, carrying sewage from the District to the Anacostia River. In addition, both the District and the United States Army used the Canal for disposal of waste: the District deposited street sweepings, dredged material, and other refuse, and sprayed the Canal with oil and/or kerosene, while the Army deposited ashes, powdered alum, mud, sewage, and other materials from the neighboring reservation.

In 1907, the Commissioners of the District of Columbia approved a plan to permanently fill the Canal after its use as a sewer was discontinued; this policy was ratified by the Commissioners in September 1916 and the portion of the Canal bordering the Site was filled by 1930 under the supervision of the District's Sanitary Engineer. The materials used to fill the Canal included street sweepings, ash, soot, garbage, refuse from street catch basins, and residential garbage. While the filled portions of the Canal remained under the ownership of the United States and within the jurisdiction of the National Park Service after 1930, the District exercised control over these areas and the city streets that formerly traversed the Site.

On December 9, 1941, a Declaration of Taking was filed in this Court by the Acting Federal Works Administrator pursuant to an Act of Congress "to provide for the Construction of Public Buildings," which resulted in the acquisition of the Site by the United States. The United States owned the Site from that date until 1985.

Shortly after it acquired the Site, the United States constructed three temporary office buildings on the eastern side of the Site and the adjoining property immediately to the south, which had also been acquired by the United States.[5] All three of the buildings utilized transformers, which provided power to the buildings by stepping down the amperage from existing power lines.

These transformers, which were housed in concrete vaults, each contained approximately 250 gallons of liquid polychlorinated biphenyls ("PCBs"). Such transformers typically "weep" or "seep" dielectric fluids containing PCBs. And while the transformers were operational, there was periodic maintenance and testing by GSA employees, which involved, among other things, determining the dielectric strength of PCB fluid in the transformers by draining fluid from such transformers into a cup for testing. Apparently, GSA employees often dumped the contents of the cup onto the ground outside the vault after the testing was completed.[6] In any event, there was visible staining of the concrete areas under the transformers.

In August 1983, the GSA, on behalf of the United States, conducted an auction for the sale of the Site. However, because of low bidding, the GSA determined not to sell the Site. On June 27, 1984, after notice and invitation, GSA conducted a sealed bid auction for sale of the Site. The high bidder at the auction was an investment partnership; however, the partnership was unable to secure the financing necessary to close the deal. Theodore Mariani, an architect and engineer who had been retained by the partnership to help with planning for the development of the Site, then helped the partnership to find other investors. The resulting investment group was Riverside, which purchased the Site in June 1985.[7]

Internal GSA Federal Property Management policies required that GSA provide notice of environmental contamination to prospective purchasers in official advertising material. However, there is no evidence that

---

5. The "Tempo C" building and the northern portion of the "Tempo B" building were located directly on the Site. Tempo C was demolished in the 1970s, and the northern portion of Tempo B was demolished prior to July 1985.

6. As the parties note in their Joint Statement, neither of the GSA employees who have testified regarding PCB transformer maintenance and testing procedures could remember whether they had observed this procedure at the Site. However-

er, the United States acknowledges that "the PCB-containing electrical transformers leaked and contaminated some areas of the Site." United States Memorandum in Support of its Motion for Summary Judgment at 37 n. 15.

7. The United States sold the Site to Riverside for $3.5 million; the Site was transferred to Riverside by Quitclaim Deed dated July 30, 1985.

Riverside was aware of the GSA internal policy at the time it purchased the Site. Moreover, the GSA bid solicitation package/contract of sale stated that the Site was to be sold " 'as is' and 'where is' without representation, warranty, or guaranty as to size, or kind, or that the same is in condition or fit to be used for the purpose for which it is intended." It is undisputed that, at the time of the purchase, none of the partners of Riverside was aware of the contamination at the Site.

Suspecting that PCB contamination of the Site might have resulted from the prior use and maintenance of the PCB–containing electrical transformers, GSA contracted in early 1986 with Versar, Inc. ("Versar"), an environmental consultant, to test for the presence of PCB contamination at the Site and the adjacent property to the south still owned by the United States. The testing revealed PCBs in concentrations exceeding 10 parts per million ("ppm") in several areas where PCB transformers were thought to have been located.[8]

Later that year, the United States, acting through GSA, notified Riverside that "unacceptable levels" of PCBs had been found on the Site and the adjoining property to the south. After seeking and obtaining the permission of Riverside to enter onto the Site for the purpose of conducting a cleanup of the PCB contamination, GSA contracted with Integrated Waste Systems, Inc. ("IWS") for the removal of PCB–contaminated soil from the six designated areas tested by Versar, two of which were on the Site; the specified size of the two areas on the Site encompassed and area slightly larger than the estimated perimeter of the former transformer vaults. IWS contracted to reduce the PCB contamination in the six designated areas to a level below 10 ppm.

In order to avoid the cost of excavating and disposing of more soil than necessary,

the GSA official who supervised the daily administration of the contract sought to insure that IWS did not remove PCB–contaminated soils from areas other that those specifically delineated in the Versar report unless he obtained the prior approval of the GSA Contracting Officer. However, due to the size of the scoop used for excavation, IWS did excavate beyond the specified perimeter of each of the designated areas; otherwise, however, PCB-contaminated soils outside of the areas specifically designated in the Versar report and the bid specifications were not excavated or removed.

At the conclusion of the soil-removal operation, an Industrial Hygienist certified that all post-excavation soil samples taken from the excavated areas had PCB concentrations less than 10 ppm. GSA accordingly notified Riverside that the cleanup had been completed. No steps were taken by the plaintiff or Riverside to verify the results of the cleanup operation.

Riverside first began its own investigation into environmental conditions at the Site after the Markborough Group ("Markborough"), a Canadian real estate investment and development company, attempted to purchase an interest in the Site. In early 1990, Markborough signed a letter of intent to purchase a 50 percent interest in Riverside for $11.5 million. Pursuant to the letter of intent, Markborough subsequently retained SCS Engineers to conduct an environmental assessment of the Site. The assessment revealed lead, mercury, and zinc in subsurface soil samples taken in the area of the former Canal, on the western portion of the Site. Eight surface soil samples taken from the eastern side of the Site exceeded the PCB action level of 10 ppm, established by EPA and used as a cleanup level by GSA in 1986. In August of that year, SCS also installed, and took groundwater samples from, four hollow stem auger borings in the Canal area. These samples showed trace lead and mercury contamination.[9] SCS recommended that

8. Because the transformers formerly located at the Site had been removed or razed prior to the time the tests were conducted, the United States could only estimate where the transformers had been located. Versar limited its testing to the vicinity of the estimated former locations of six transformers and did not sample or test for PCBs in other areas.

9. SCS indicated in its report that the samples were not taken in accordance with sampling protocols established by EPA and therefore were not necessarily representative of the entire Site.

additional sampling be conducted to evaluate the vertical distribution and concentrations of contaminants underlying the Site. However, as a result of the assessment, Markborough withdrew its purchase proposal.

A preliminary site investigation was thereafter conducted on behalf of Riverside by Environmental Strategies Corporation ("ESC") from September to November 1990. As part of its investigation of the Site, ESC installed 37 soil borings, including 18 borings in the area of the former canal on the western side of the Site, and collected a total of 196 soil samples form these borings for laboratory analysis. Analysis revealed levels of lead exceeding 1,000 ppm and mercury exceeding 1 ppm in a number of the samples taken from the Site. The majority of the lead and mercury contamination was detected in the area of the former Canal, at depths between 10 and 20 feet below ground surface, along the entire former length of the Canal. Levels of total TPHs in excess of 100 ppm were detected in soils on the southern portion of the Site, along the Canal area.

ESC conducted additional groundwater sampling in September and November of 1990 at six monitoring wells installed at the Site. This additional testing revealed levels of *total* lead, *total* mercury, and TPH in excess of the Maximum Contaminant Levels for drinking water established by EPA, but levels of *dissolved* lead and *dissolved* mercury below those same drinking water standards.

ESC conducted another site investigation on behalf of Riverside in June 1994 in order to determine whether the material used to fill the former Canal contains residual chemicals from military ordnance, and whether the fill material should be classified as hazardous because it contains arsenic. ESC concluded that the fill material did not contain residual chemicals from high explosive military ordnance such as nitrobenzenes, nitrotoluene, nitroglycerine, or nitrocellulose. ESC did find polycyclic aromatic hydrocarbons ("PAHs") in excess of 10 ppm in some soil samples taken from the western side of the Site, and leachable lead in certain samples exceeding 5.0 milligrams per liter ("mg/1") established under EPA's Toxicity Character-

istic Leaching Procedure for defining hazardous waste, in addition to confirming that soils at the Site had been contaminated by TPH. It concluded, however, that the levels of mercury and arsenic found at the Site were not significant.

Subsequent to the discovery of contamination at the Site, Riverside was restructured, making the plaintiff the sole general partner, and giving him a fifty percent interest in the partnership. As a result of this restructuring, the plaintiff obtained additional interests in the Site. The plaintiff also took steps after September 1990 to acquire additional property that now constitutes part of the Site. He petitioned the District to close an unused section of R Street, S.W., that formerly ran through the Site. The approximately one-half acre parcel, having an assessed value of $781,984, was transferred to Riverside in 1994.

The Site currently sits behind a locked fence. There are two distinct areas of contamination at the Site. The eastern portion of the Site, where the PCB-containing vaults were formerly located, is contaminated only with PCBs. The western portion of the Site, which was formerly part of the Canal, is contaminated with lead and mercury. The bulk of the costs likely to be incurred in cleaning up the entire Site is associated with the lead in the western portion of the Site. U.S. Add'l St. of Mat'l Facts, ¶ 4; Dep. of Kent David Campbell, at pp. 180–81.

The severity of the threat posed by the contamination is in dispute. Asphalt pavement covers the former area of the Canal, the groundwater at the Site is not used for drinking water or other purposes, and, due to current market conditions, Riverside is not actively seeking to market or develop the Site. Riverside has no current cleanup plans for the Site until it has funding from a prospective purchaser, a development partner, or the United States and/or the District.

## DISCUSSION

 Under the CERCLA, both the Government and private parties may take response action whenever there is a release or threatened release of "hazardous sub-

stances," and then sue certain persons for reimbursement of the cleanup costs ("Response Costs"). 42 U.S.C. §§ 9604, 9607(a)(4). In order to establish liability under the CERCLA, the plaintiff must establish that

(1) a release or threatened release [10] of a hazardous substance [11] has occurred at the Site;

(2) the Site is a "facility"; [12]

(3) the release or threatened release has caused the plaintiff to incur response costs; [13] and

(4) the defendants are potentially responsible parties ("PRPs").[14]

*Town of Munster v. Sherwin–Williams Co.,* 27 F.3d 1268, 1273 (7th Cir.1994); *Amoco Oil v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir.1985); *Northwestern Mutual Life Ins. Co. v. Atlantic Research Corp.,* 847 F.Supp. 389, 395 (E.D.Va.1994). "Absent a showing by a preponderance of the

evidence that one of the affirmative defenses contained in ... 42 U.S.C. § 9607(b), has been satisfied, PRPs' potential liability for Response Costs is strict." *United States v. A & N Cleaners and Launderers, Inc.,* 854 F.Supp. 229, 237 (S.D.N.Y.1994) (citing *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2d Cir.1992) and *New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985)). When the environmental harm to be remediated is indivisible, liability is also joint and several. *Id.* (citing *B.F. Goodrich,* 958 F.2d at 1197).

It is undisputed that both the soil and ground water at the site contain "hazardous substances" within the meaning of 42 U.S.C. § 9601(14), that the presence and potential or actual migration of such substances constitutes a "release" or threatened "release," and that the Site is a "facility." Moreover, the United States concedes that it is a liable party under 42 U.S.C. § 9607(a) and therefore subject to a declaratory judgment for future response costs incurred by the plain-

**10.** A "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) ..." 42 U.S.C. § 9601(22).

**11.** A "hazardous substance" is defined as

(A) Any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of [CERCLA], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof ... natural gas, natural gas liquids, liquefied natural gas, or synthetic gas useable for fuel....

42 U.S.C. § 9601(14) (citations omitted).

**12.** A "facility" is defined as

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel....

42 U.S.C. § 9601(9).

**13.** Response costs incurred by the Government must be "not inconsistent with" the National Contingency Plan ("NCP"), while Response Costs incurred by private parties must be "consistent" with the National Contingency Plan. 42 U.S.C. § 9607(a)(4). In its 1990 revisions to the NCP, EPA took the position that there is no requirement that a site be listed on the NPL before a private party may incur response costs remediating the site that are recoverable under the CERCLA. *See* 55 Fed.Reg. 8666, 8793 n. 29 (1990).

**14.** Under the CERCLA, there are four classes of PRPs: (1) the current owner or operator of a contaminated facility; (2) the owner or operator of a facility at the time it became contaminated; (3) any person who arranges for transport or disposal of hazardous wastes; and (4) any person who accepts hazardous wastes for the purpose of transport or disposal. 42 U.S.C. § 9607(a)(1)–(4).

tiff pursuant to 42 U.S.C. § 9613(g)(2) with regard to PCB contamination at the Site.[15] However, the United States contests liability for the release of hazardous substances at the Site other than PCBs, and the District disputes liability for any contamination at the Site, maintaining that the plaintiff has failed to demonstrate either that his claims are ripe or that the District caused the contamination at the Site.

Because the plaintiff fails to demonstrate that his past investigative costs were necessary and consistent with the NCP he is not entitled to recover them from the defendants. And because he fails to demonstrate that he is entitled to an affirmative defense thereto, the plaintiff is liable as a current owner of the Site. Therefore, summary judgment is warranted with respect to the defendants' liability for past response costs incurred by the plaintiff and the plaintiff's liability. However, disputed issues of material fact preclude the award of summary judgment with respect to the liability of the United States and the District for future response costs necessitated by the lead and mercury contamination at the Site.

## A. BECAUSE THE PLAINTIFF FAILS TO ESTABLISH THAT HIS PAST INVESTIGATORY COSTS WERE CONSISTENT WITH THE NCP, THE COURT SHALL GRANT THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO THE PLAINTIFF'S CLAIM TO RECOVER THEM FROM THE DEFENDANTS.

The plaintiff's claims under the CERCLA may be divided into two groups: his claims against the defendants for past response costs and his claims against them for future response costs. The first seeks to recover money he has already spent investigating the contamination at the Site; the second essentially seeks injunctive and declaratory relief.

With regard to his claims for past response costs, the plaintiff has failed to establish that the costs he incurred were both necessary and consistent with the NCP. 42 U.S.C. § 9607(a)(4). Like the other elements of a prima facie claim for contribution or recovery under the CERCLA, the plaintiff bears the burden of proof on both of these questions. *See G.J. Leasing Co. v. Union Elec. Co.,* 854 F.Supp. 539, 561 (S.D.Ill.1994). Because the plaintiff's investigatory costs were not incurred in response to a perceived threat to human health or the environment, he is not entitled to recover them from the defendants.

"[I]n the context of investigatory costs, plaintiffs may recover only those costs that were reasonable, cost-effective, and likely to lead to a CERCLA quality clean-up." *Licciardi v. Murphy Oil USA, Inc.,* Civ. No. 93–490, 1995 WL 45861, at *4, 1995 U.S.Dist. LEXIS 1276, at *10 (Feb. 2, 1995). To show that any response costs were necessary under the CERCLA, the plaintiff must show "(1) that the costs [were] incurred *in response to* a threat to human health or the environment and 2) that the costs were necessary to address that threat." *G.J. Leasing Co.,* 854 F.Supp. at 562 (emphasis in original). "To the extent that [site investigations and abatement actions] were taken for purposes other than responding to an actual and real public threat, there is no CERCLA liability." *Id.*

Although Riverside was apprised of the presence of PCBs at the Site as early as July of 1986, it did not seek to determine whether the contamination presented a public health threat. Not until the discovery of further contamination by Markborough in 1990, did the plaintiff or his partners take any action to determine the extent of contamination at the Site. And the eventual decision to hire ESC consultants was not taken in response to a perceived threat to health or the environment, but in order to further identify

---

15. In its Renewed Motion for Summary Judgment, the United States seeks a declaratory judgment that the plaintiff and/or Riverside is liable under the CERCLA for two-thirds of the response costs that have been or will be incurred with respect to PCB contamination at the Site, that the United States and the District are liable under the CERCLA for only the remainder of any costs consistent with the NCP, and that the United States is not and cannot be held liable for cost reimbursement under the RCRA.

barriers to the development of the Site. Thus, the plaintiff fails to establish that his past costs were necessary and consistent with the NCP; therefore, he may not recover them from the defendants.

### B. THE PLAINTIFF IS LIABLE AS A CURRENT OWNER OF THE SITE BECAUSE HE HAS FAILED TO ESTABLISH, BY A PREPONDERANCE OF THE EVIDENCE, THAT HE IS ENTITLED TO THE INNOCENT LANDOWNER DEFENSE. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE THE DEFENDANTS FROM ASSERTING THE THIRD PARTY DEFENSE.

■ Both the defendants and the plaintiff assert a number of equitable defenses to liability.[16] However, none of the equitable defenses asserted by the parties is available to them. "The plain language of § 107 explicitly limits the defenses to liability under CERCLA to those enumerated in the statute, none of which mention or even imply that equitable defenses are available." *Town of Munster, Ind. v. Sherwin–Williams,* 27 F.3d 1268, 1273 (7th Cir.1994). *See also United States v. DiBiase Salem Realty Trust,* Civ.A. No. 91–11028–MA, 1993 WL 729662, at *6 (D.Mass. Nov. 19, 1993) ("CERCLA provides only limited, specifically enumerated defenses to liability."). Therefore, the Court need only address those defenses set forth in the CERCLA.

Two statutory defenses are raised by the plaintiff to the counterclaims asserted against him: the so-called "third party" and "innocent landowner" defenses. The Court concludes that neither defense is available to the plaintiff.

Under the CERCLA's "third party" defense, an otherwise liable party can avoid liability by establishing that the release or threatened release was caused solely by:

> an act or omission of a third party other than an employee or agent of the [party asserting the defense], or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with [the party asserting the defense] ...

42 U.S.C. § 9607(b)(3). In addition to the "no contractual relationship" and ."sole cause" requirements, the party asserting the defense must establish

> that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances (the "due care requirement"), and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result for such acts or omissions (the "precautionary requirement").

42 U.S.C. § 9607(b)(3)(a) and (b). Thus, a party who demonstrates that a third party is solely responsible for the release must still prove that he exercised "due care" and took all appropriate "precautions" to prevent release of the hazardous substance(s).

■ The due care requirement has been defined to require that a the person asserting the third party defense to demonstrate that he took necessary steps to prevent foreseeable adverse consequences arising from the contamination. *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 325 & n. 3 (7th Cir.1994) (due care not established when PRP took no affirmative measures to clean site); *United States v. DiBiase Salem Realty Trust,* Civ.A. No. 91–11028–MA, 1993 WL 729662 (D.Mass. Nov. 19, 1993) (CERCLA's affirmative defenses not available when defendant took no steps to prevent harm

---

**16.** The defendants argue that in purchasing the Site, the plaintiff assumed the risk of any contamination. and any costs associated therewith and waived any claims against the defendants. The defendants also argue that the plaintiff's claims are barred by laches and estoppel because, whether as a result of indifference, acquiescence, or neglect, he has allowed the property to become contaminated since its purchase, and he has failed to mitigate his damages. In response to the District's counterclaims, the plaintiff argues that claims asserted by the District are barred by the doctrines of unclean hands and *in pari delicto,* and that the District is estopped from seeking contribution and indemnity from him for its liability for *response costs* by virtue of its acts and omissions that have caused and contributed to its role in contaminating the Site.

from hazardous substances). The precautionary requirement is satisfied by taking precautionary steps against the foreseeable actions of third parties responsible for the hazardous substances in question. *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

The second defense asserted by the plaintiff, the "innocent purchaser" or "innocent landowner" defense, is actually an incident of the third party defense. *DiBiase*, 1993 WL 729662, at *6. Because land deeds and other instruments transferring possession are normally a sufficient "contractual relationship" to preclude assertion of the third party defense, *see* 42 U.S.C. § 9601(35), Congress created an exception to the "no contractual relationship" requirement of the third party defense, thereby making it available to some owners who acquired the relevant property after the disposal or placement of hazardous substances occurred.

Thereunder, a "contractual relationship" for purposes of the section 9607(b)(3) is defined as including

> land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility and ... the defendant [establishes] by a preponderance of the evidence [that a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

42 U.S.C. § 9601(35)(A)(i). However, even if the defendant meets the requirements of this exception to the "contractual relationship" requirement, he still "must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b)." *Id.* Thus, to qualify as an innocent landowner under 42 U.S.C. § 9601(35)(A), one must have undertaken "all appropriate inquiry into the previous ownership and uses of the property, consistent with good commercial or customary practice" at the time of transfer. 42 U.S.C. § 9601(35)(B).

" 'Good commercial or customary practice' is not defined in the statute, and the relevant legislative history is vague, indicating that 'a reasonable inquiry must have been made in all circumstances, in light of best business and land transfer principles.' " *A & N Cleaners*, 854 F.Supp. at 238 (quoting H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess., at 187 (1986)), reprinted in 1986 U.S.S.C.A.N. 2835, 3280. In deciding whether a defendant has complied with this standard, courts are directed to consider

> any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35)(B). This required showing is in addition to the due care and precautionary requirements of 42 U.S.C. § 9607(b)(3)(a) and (b). *See* 42 U.S.C. § 9601(35)(A).

■ The third party and innocent landowner defense are affirmative defenses, requiring the defendant to prove each of the required elements by a preponderance of the evidence. *City of New York v. Exxon Corp.*, 766 F.Supp. 177, 195 (S.D.N.Y.1991); *United States v. Price*, 577 F.Supp. 1103, 1114 (D.N.J.1983). "A defendant's failure to meet its burden on any one of the required elements precludes the application of the defense." *A & N Cleaners*, 854 F.Supp. at 239 (citing *In re Sterling Steel Treating, Inc.*, 94 B.R. 924, 929 (Bankr.E.D.Mich.1989)).

**(1) The plaintiff does not qualify as an "innocent landowner" entitled to the third-party defense under 42 U.S.C. §§ 9607(b)(3) and 9601(35), and is therefore liable as a "current owner" of the Site under 42 U.S.C. § 9607(a)(1).**

■ The plaintiff fails to meet the heavy burden of proof necessary to avoid liability

through the third party defense or its corollary, the innocent landowner defense. Given the commercial/industrial setting of the Site, the high duty of inquiry attached to commercial transactions, the relative ease with which the contamination at the Site could have been discovered prior to purchase, the collective real estate experience of the Riverside partners, and the disparity between the purchase price and the appraised value of the Site without contamination, it was incumbent upon the plaintiff to investigate possible contamination at the Site; he or his partners could readily have discovered the contamination with reasonable inquiry prior to its acquisition. Yet even after discovering the contamination, neither he nor his partners took any steps to abate it, to notify the appropriate regulatory authorities or adjoining landowners of the contamination, or to secure the Site or restrict access to it. In sum, the plaintiff failed to exercise due care or take appropriate precautionary measures with respect to contamination at the Site. His failure to do so precludes his assertion of the innocent landowner defense or third party defense.

a. **The plaintiff made no inquiry regarding the possible contamination at the Site at the time of its original acquisition.**

The plaintiff cannot establish that, at the time Riverside purchased the Site from GSA, he "had no reason to know" of the presence of hazardous substances at the Site. 42 U.S.C. § 9601(35). He failed to make "all appropriate inquiry into the previous ownership and uses of the property consistent with food commercial or customary practice in an effort to minimize [potential] liability." *Id.* § 9601(35)(B). Moreover, the fact that the plaintiff took title in the form of a Quit Claim Deed is further evidence that he purchased the Site without any warranty as to its title and in an "as is" condition.

When Riverside purchased the property from the United States it appears that the partnership gave little or no consideration to environmental risks present at the Site. Notwithstanding that GSA maintained a publicly available inventory of all government buildings located in the District that housed transformers containing PCBs, Riverside made no search thereof. Although it was "commonly known or reasonably ascertainable" that a portion of the Site contained an old canal that had been filled, *see* Mariani Dep. at 14–15, the plaintiff does not recall having visited the Site prior to its purchase and Riverside conducted no environmental investigation of the Site. Instead, the Site was presumed to be free of contamination based upon cursory visual inspections of the Site by Mariani, despite evidence in the record that, at the time of the sale, the soil was visibly stained by PCB–contaminated oil. Other than these cursory visual inspections, Riverside purchased the Site, which was located in a run-down industrial area, without conducting any investigation into the environmental conditions at the Site.

In *United States v. A & N Cleaners and Launderers, Inc.,* 854 F.Supp. 229 (S.D.N.Y. 1994), the court held that when the defendants had reason to inquire of former owner and the relevant environmental officials regarding the former owner's disposal practices,

> the failure to so inquire was itself a lack of due care with respect to the hazardous substances which were later found on the Property. It is no defense to insist that, in the course of ongoing testing, the Government should have notified the [defendants] that there was a problem on the Property, since Congress has seen fit to shift the public responsibility of locating contamination onto the shoulders of individual property owners.

854 F.Supp. at 244. The plaintiff here asserts the very defense held unpersuasive in *A & N Cleaners:* he argues that it was incumbent upon the defendants to notify Riverside of contamination at the Site and that it was reasonable for Riverside to assume that the United States would not have sold it a contaminated parcel of land. However, nothing supports a result contrary to that reached in *A & N Cleaners.*

Courts are directed to consider any specialized knowledge or experience on the part of the purchaser. The original Riverside partners were the plaintiff, Mariani, and

Manuel Fernandez. The plaintiff has been a principal in the Long & Foster companies since their founding in 1968, and the President and majority stockholder since 1979. Long & Foster handles both residential and commercial real estate; in 1988, its commercial division alone did $394 million in business. In addition, the plaintiff is a partner in at least 15 commercial real estate partnerships besides Riverside. Mariani is a former Vice–President of the American Institute of Architects, and has served as Chair of the District of Columbia Zoning Commission. He has been involved as an investor in a number of real estate transactions, some of which involved industrial and/or commercial or mixed-use property. Fernandez developed and operated a hotel and restaurant in Southwest Washington, D.C., and has made investments in other real estate projects. It cannot be said that this is a group unknowledgeable or inexperienced in commercial real estate transactions.

Furthermore, the disparity in price between the purchase price of the Site and its appraised value (as well as those of comparable properties) supports the conclusion that the plaintiff had reason to know or at least cause to investigate the reasons for such disparity. As noted, the United States sold the Site to Riverside in mid–1985 for $3.5 million. Yet shortly before purchase, the plaintiff's partner, Mariani, estimated that the Site was worth two to three times the purchase price. Indeed, at the time of the sale, Riverside obtained an appraisal of the Site at $5,200,000 as is, and at $10.5 million with mixed-use zoning. And it was the plaintiff's understanding, at the time of purchase, that comparable properties in the area were selling for greater than five times the purchase price of the Site.

The plaintiff argues that neither the United States nor Riverside were unaware of any contamination at the time of the purchase, and that the valuation of the Site was therefore a function of zoning, not contamination. However, it is the relevant market, and not the seller's (or the buyer's) knowledge alone, that underlies the valuation of property. There may well have been other parties who knew or suspected that the Site was contaminated; that knowledge or suspicion, in turn, may well have driven the price of the Site down to account for the contamination. The disparity between the price paid by Riverside and the price comparable properties were fetching suggests as much.

In any event, the plaintiff's argument contravenes the nature of the CERCLA's liability scheme, which was intended to not only ensure that those who were responsible for, and who profited from, activities leading to property contamination, rather than the public at large, should be responsible for the costs of the problems that they had caused, *see United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 716 (2d Cir.1993); *B.F. Goodrich Co.*, 958 F.2d at 1198; *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986) ("Congress intended [through passage of CERCLA] that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created."); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 805–06 (S.D.Ohio 1983); but also to provide incentives for private parties to investigate potential sources of contamination and to initiate remediation efforts, *see Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F.Supp. 814, 817 (S.D.N.Y.1990) (quoting *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 617 (S.D.N.Y.1986)) ("One of the major objectives of the private recovery provisions of CERCLA is to 'assure an incentive for private parties, including those who may themselves be subject to liability under the statute, to take a leading role in cleaning up hazardous waste facilities as rapidly and completely as possible.' "); *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 694 (9th Cir.1988) (one of CERCLA's purposes is to promote private enforcement actions independent of government actions funded by Superfund); *Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 386 (8th Cir.1987) ("Since superfund money is limited, Congress clearly intended private parties to assume clean-up responsibility."); *Chem–Dyne Corp.*, 572 F.Supp. at 805 (CERCLA passed, in part, to induce voluntary private responses at contaminated sites).

"The imposition of strict liability solely on the basis of property ownership.... transfers the costs of the national problem of remediating abandoned contaminated sites onto the shoulders of individuals involved in real estate transactions, many of whom had never violated any environmental regulation, thereby negating Congress' intention of making those responsible for causing contamination pay for its remediation." *A & N Cleaners*, 854 F.Supp. at 240 (citing Jerry L. Anderson, *The Hazardous Waste Land*, 13 VA. ENVT'L L.J. 1, 6 (1993) ("[CERCLA c]leanup costs are often borne by those who are not responsible for the problem at all and ... many other parties are held liable to an extent far exceeding their actual responsibility.")). Accordingly, it was incumbent upon the plaintiff and his partners to investigate the condition of the Site prior to purchasing it.

Riverside had "an affirmative duty" under section 42 U.S.C. § 9601(35)(B) to inquire into the past uses of the Site. *Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1287 (E.D.Pa.1994). To "assume the land was clean ... [j]ust based on looking at it," *see* Mariani Dep. at 113–14, did not satisfy that affirmative duty, particularly in a commercial transaction. *See* H.R.Rep. No. 962, 99th Cong., 2d Sess. 187 (1986) reprinted in 1986 U.S.S.C.A.N. 2835, 3280 ("Those engaged in commercial transactions should ... be held to a higher standard of inquiry that those who are engaged in private residential transactions.").

**b. Following the discovery of contamination at the Site, the plaintiff failed to take appropriate precautions with respect thereto.**

For the plaintiff to establish that he took all appropriate precautions with respect to the contamination at the Site, the legislative history of the CERCLA suggests that "he must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." H.Rep. No. 1016, 96th Cong., 2d Sess., pt. I, at 34 (1980), reprinted in 1980 U.S.C.C.A.N. 6119,

6137. For example, the Second Circuit found that a defendant failed to take appropriate precautions when it did nothing to forestall the readily foreseeable hazards posed by wastes others had dumped on its land. *New York v. Shore Realty*, 759 F.2d 1032, 1049 (2d Cir.1985).

In the instant case, Riverside and its partners did nothing—apart from conducting some additional tests—to remediate the conditions at the Site, even after concededly becoming aware of the presence of hazardous substances. Riverside did not effectively assess the status of the Site, nor did it restrict access to the Site until 1995. *See* Joint Statement ¶ 130. Indeed, notwithstanding that it was aware of PCB contamination as early as 1986, and mercury and lead contamination as early as 1990, Riverside failed to notify the United States or the District or to raise a claim regarding the contamination prior to 1994. Apparently, this was due, at least in part, to Riverside's concern that raising a claim might result in the District not approving the closing of R Street, thereby frustrating its attempt to lease the Site to GSA. The contamination remains and Riverside has no current cleanup plans nor can it point to any attempt to ameliorate the conditions at the Site. To avail himself of the third party defense, more is required of the plaintiff than this. *See* H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 187 (1986) reprinted in 1986 U.S.S.C.A.N. 2835, 3280 (due care "would include those steps necessary to protect the public from a health or environmental threat"); *cf. Lincoln Props. v. Higgins*, 823 F.Supp. 1528, 1543 (E.D.Cal.1992) (defendant exercised due care by taking contaminated wells out of service and destroying them in manner intended to prevent further contamination); *In re Sterling*, 94 B.R. at 930 (defendant exercised due care after discovering hazardous waste on property when it took immediate steps to properly dispose thereof). "In no circumstances can 'no care' be considered 'due care.'" *DiBiase*, 1993 WL 729662, at *7. Therefore, the Court concludes that the plaintiff is not entitled to assert the third party defense.[17]

---

17. Because the plaintiff is himself a liable party, he may not recover all his allowable costs from

**2. Because the defendants fail to establish that the contamination at the Site was caused solely by the actions of a third party, neither is entitled to assert the third party defense.**

While liability under the CERCLA is strict, the question of causation is not absent from liability considerations under 42 U.S.C. § 9607. *Id.* CERCLA's affirmative defenses shift the burden of proof on this question from the plaintiff to the defendant, who must show by a preponderance of the evidence that the release or threatened release was caused solely by an unrelated third party. *See Shore Realty Corp.,* 759 F.2d at 1044–45 & n. 17; *United States v. Stringfellow,* 661 F.Supp. 1053, 1061 (C.D.Cal.1987) (third-party defense applies "only where a totally unrelated third party is the sole cause of the release or threatened release of a hazardous substance"); *O'Neil v. Picillo,* 682 F.Supp. 706, 728 (D.R.I.1988) ("third-party defense 'essentially serv[es] to shift the burden of proof of causation to the defendants'") (quoting *Violet v. Picillo,* 648 F.Supp. 1283, 1293 (D.R.I.1986)), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). As discussed more fully below, the uncertainty surrounding the origin of the contamination precludes the assertion of the third party defense by either of the defendants.

**C. SUMMARY JUDGMENT IS NOT WARRANTED WITH RESPECT TO THE PLAINTIFF'S CLAIMS AGAINST THE DISTRICT AND THE UNITED STATES FOR FUTURE RESPONSE COSTS BECAUSE THE SOURCE AND TIMING OF THE LEAD AND MERCURY CONTAMINATION AT THE SITE IS IN DISPUTE.**

The plaintiff's argument is essentially this: The contaminants now present at the Site were present when Riverside purchased it. From 1941 until the time it was sold to Riverside, the Site was owned by the United States. Prior to that, and since the time the Canal was filled, the District owned the Site. And before then, the Canal, which was owned by the United States and "operated" by the District, occupied the location. These facts, he argues, together with the location and depth of the contamination, i.e., along the area of the former Canal at depths of twenty feet, and the fact that the District filled the Canal and the United States likely produced and disposed of wastes such as those which are found in the soil at the Site, suggests that the District and the United States are responsible for the contamination.

The depth and location of the contamination together with the history of the Site provide a reasonable basis for the conclusion that the United States and the District are liable for the contamination by virtue of their status as former owners and/or operators of the Site. But they do not compel it. Because the Court concludes that this material fact is in dispute, summary judgment in favor of the plaintiff is unwarranted. The defendants' Motions fail for the essentially the same reason. That the plaintiff is unable to establish on summary judgment that the defendants' are liable as a matter of law, does not preclude him from pursuing his claims at trial. Therefore, the Court will deny the defendants' as well as the plaintiff's Motions for Summary Judgment with respect to future response costs necessitated by the contamination at the Site.

**1. The TPHs and PAHs found at the Site are not "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).**

As a threshold matter, the plaintiff identifies a number of contaminants found at the Site including PAHs and TPHs. In addition, the plaintiff argues that the District is liable for contamination at the Site because, among other things, it allegedly sprayed the Canal with kerosene. The terms "hazardous substances," as defined at 42 U.S.C. § 9601(14) explicitly excludes "petroleum, including crude oil or any fraction thereof...."

other liable parties through a recovery action under 42 U.S.C. § 9607. Instead, he may recover only an equitable allocation of those costs under 42 U.S.C. § 9613. However, given the

disputed issues of material fact surrounding the potential liability of the defendants, allocation of the costs is obviously premature at this juncture.

from the reach of CERCLA liability. This exclusion has been interpreted by the EPA to "apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products." 50 Fed.Reg. 13460. Petroleum in these forms is excluded from the substances listed by the EPA at 40 C.F.R. § 302.4. Accordingly, courts have consistently excluded petroleum from the reach of the CERCLA. *See, e.g., Cose v. Getty Oil Co.,* 4 F.3d 700 (9th Cir.1993); *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801 (9th Cir.1989); *City of New York v. Exxon Corp.,* 766 F.Supp. 177 (S.D.N.Y.1991). And while "waste" or "used" petroleum products may not be within the exception by virtue of their having been contaminated with hazardous substances, the exhibits upon which the plaintiff relies make no reference to the petroleum substances at issue being "waste" or "used." Therefore, because the plaintiff fails to demonstrate that the PAHs, TPHs, and kerosene present at the Site fall outside of the CERCLA's exception for petroleum products, no CERCLA liability may attach for contamination related to such. Thus, the only substances identified at the Site for which CERCLA liability may attach are lead, mercury, and PCBs.

### 2. Disputed issues of material fact surround the origin of the lead and mercury present at the Site and the time of its disposal.

The linchpin of the defendants' argument is the plaintiff's inability to conclusively establish either the manner or timing of the contamination. Thus, the defendants maintain, the plaintiff cannot establish either that hazardous substances were disposed of by the defendants or that they were owners and/or operators "*at the time of disposal of hazardous substances.*" 42 U.S.C. § 9607(a)(2) (emphasis added).

The facts are murky. While it is undisputed that the United States operated an arsenal in close proximity to the Site, manufacturing operations at the reservation were centered *downstream* from the Site and ceased almost immediately after the Canal

was created, *see* Dep. of Ruth Ann Overbeck at 121, 394–95, while in the late nineteenth century various industrial activities of all types located *upstream* of the Site produced lead wastes such as are now present at the Site, *id.* at 99, 310–11, and Ex. 1 at 1. Furthermore, there is no direct evidence in the record regarding the specific types of wastes produced by the manufacture of munitions at the reservation, nor is there any evidence in the record regarding the manner of disposal of any such wastes. And there is no direct evidence that the materials used to fill the Canal contained hazardous substances. In light of these uncertainties, the plaintiff asks the Court to infer from the nature of the activities at the reservation, the filling of the Canal, and the depth and nature of the contaminants found at the Site that the activities of the United States and the District resulted in the release of lead and mercury at the western portion of the Site.

The release or threatened release "of a or any hazardous substance" is sufficient to establish liability. *United States v. Wade,* 577 F.Supp. 1326, 1333 (E.D.Pa.1983) ("[T]he release which results in the incurrence of response costs and liability need only be of 'a' hazardous substance and not necessarily one contained in the defendant's waste."). However, a defendant generally must have had something along the lines of actual control over the disposal of hazardous waste to be held liable therefor. *See Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir.1994); *Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir.1991); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985). In addition, several courts have held that "passive" disposal of hazardous waste is insufficient to serve as the basis of liability under § 9607(a). *United States v. Petersen Sand and Gravel, Inc.,* 806 F.Supp. 1346, 1351 (N.D.Ill.1992); *Ecodyne Corp. v. Shah,* 718 F.Supp. 1454, 1455–57 (N.D.Cal.1989); *see also Cadillac Fairview/California, Inc. v. Dow Chem. Co.,* CV Nos. 83–7996–LTL, 83–8034–LTL, 21 ERC (BNA) 1108, 14 Envtl.L.Rep. 20376, at 10 ("[T]he scope of liability of the [CERCLA] is not so broad as to encompass a party who merely owned the site at a previous point in

time, who neither deposited nor allowed others to deposit wastes on the site.").

The essence of the District's argument is that, because the plaintiff has not alleged that the District was an "owner" during the time of the release, direct proof of the time of disposal is necessary to establish its liability as an operator "at the time of disposal" of "hazardous substances." The District maintains that because the plaintiff cannot establish the time of disposal his claim against the District should be dismissed. The United States argues that it is entitled to judgment as a matter of law on the issue of its own liability because the plaintiff offers no direct proof that it contributed to the contamination at the western portion of the Site or that such contamination occurred during the period it owned either the Canal or the Site.

Notably, however, the District does not deny its control over the Site prior to 1930 and names no party, other than the United States, that may have been responsible for the contamination of the fill material that now makes up the Site. The Canal was filled under the supervision of the District's Sanitary Engineer. Therefore, it cannot be said that the District lacked actual control over the disposal of the fill materials. Nor can it be said that the United States lacked actual control over the disposal of wastes from the neighboring military reservation or the Canal itself. Yet while the evidence may preponderate in favor of the conclusion that the fill materials and/or the wastes from the Canal and Fort McNair contained hazardous substances, *see* U.S. Memorandum in Support of its Motion for Summary Judgment at 38 (acknowledging that the prior ownership of the Canal by the United States, and the District's prior operation thereof, may be "sufficient for a threshold finding of liability under CERCLA"), this is an issue of fact, incapable of resolution as a matter of law. Accordingly, the Court shall deny the plaintiff Motion for Partial Summary Judgment and the defendants' Motions for Summary

Judgment regarding their own liability for future response costs associated with lead and mercury contamination at the Site.

**D. BECAUSE THE PLAINTIFF HAS NOT ESTABLISHED THAT THE CONTAMINATION AT THE SITE MAY PRESENT A SUBSTANTIAL AND IMMINENT ENDANGERMENT TO HUMAN HEALTH OR THE ENVIRONMENT, THE COURT SHALL GRANT THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE PLAINTIFF'S CLAIMS UNDER THE RCRA.**

The RCRA establishes a "cradle to grave" regulatory scheme for wastes deemed hazardous under Subtitle C of RCRA; wastes that are not "hazardous" under Subtitle C are less stringently regulated under other provisions of RCRA as "solid waste." *City of Chicago v. Environmental Defense Fund,* —— U.S. ——, ——, 114 S.Ct. 1588, 1590, 128 L.Ed.2d 302 (1994). To establish a prima facie case under RCRA, a claimant must demonstrate:

(1) conditions that may present an imminent and substantial endangerment to health or the environment;

(2) that the endangerment stems from a solid or hazardous waste as defined by the RCRA; and

(3) that the defendants have contributed to or are contributing to such handling, storage, treatment, transportation or disposal.

*Craig Lyle Ltd. Partnership v. Land O'Lakes,* 877 F.Supp. 476, 480 (D.Minn. 1995).[18] The plaintiff asserts that the conditions at the Site present an imminent and substantial endangerment to health and/or the environment and that the United States and the District have contributed to the endangerment; he accordingly seeks an order directing both defendants to abate the en-

---

**18.** The citizen suit provision specifically delineates the injunctive relief available in such an action:

The district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . . to order such person to take such other action as may be necessary, or both. . . .

42 U.S.C. § 6972(a).

dangerment at the Site and recovery of expenses he has already incurred with respect to the investigation of contamination at the Site.[19]

 The uncertainty surrounding the origin of the contamination at the Site precludes a finding that the defendants have contributed to the handling, storage, treatment, transportation or disposal of hazardous wastes at the Site. However, even assuming *arguendo* that the defendants "contributed to the handling, storage, treatment, transportation, or disposal of . . . solid or hazardous waste," the plaintiff cannot establish that the Site "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Because the plaintiff cannot establish this element of his claim under the RCRA, the Court shall grant the defendants' Motion for Summary Judgment.

In contrast to the CERCLA, which requires only a showing that a release of a hazardous substance has occurred, 42 U.S.C. § 6972(a)(1)(B) requires more than a mere showing that solid or hazardous wastes are present at the Site. *See United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 184 (W.D.Mo.1985) (proof of "an imminent and substantial endangerment" is not an element of a prima facie case under the CERCLA). Instead, a claimant must establish that an "imminent and substantial endangerment to health or the environment" exists.

 An imminent and substantial endangerment exists if there is "reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Id.* at 194. In order to establish "imminence," the plaintiff must prove that the risk of threatened harm is *currently* present on the Site, and that the "potential for harm is great." *United States v. Aceto Agricultural Chems. Corp.*, 872 F.2d 1373, 1383 (8th Cir.1989); *see also Price v.*

*United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994) (imminence refers to the nature of the threat rather than identification of the time when the endangerment initially arose). Thus, any alleged endangerment "must be substantial or serious, and there must be some necessity for the action." *Price*, 39 F.3d at 1019.

In *Price*, the district court heard testimony from expert witnesses who

agreed that for an imminent and substantial endangerment to exist (1) *there must be a population at risk*, (2) the contaminants must be listed as hazardous under RCRA, (3) the level of contaminants must be above levels that are considered acceptable by the State, and (4) *there must be a pathway of exposure*.

*Price v. United States Navy*, 818 F.Supp. 1323, 1325 (S.D.Cal.1992) (emphasis added). In affirming, the Ninth Circuit agreed that there was no present imminent or substantial endangerment to health or the environment, despite the conclusion that contaminants (lead and asbestos) probably remained on the property at issue. Central to the court's conclusion was a concrete barrier that blocked the only pathway to lead contamination. 39 F.3d at 1019–20. The defendant's argue that the asphalt paving which covers the Canal area at the Site, *see* Joint Statement, ¶ 133, performs a similar function and that there is no "reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Conservation Chem. Co.*, 619 F.Supp. at 194.

The report prepared by the plaintiff's proposed opinion witness pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) contains no opinion that an imminent and substantial endangerment to health or the environment exists at the Site. Moreover, the report of Frank Anastasi, the United States' proposed

---

**19.** As the Supreme Court recently held in *Meghrig v. KFC Western, Inc.*, —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), the citizen suit provision of the RCRA, which authorizes private parties to bring suit to "restrain" persons responsible for solid or hazardous waste contamination that poses "imminent and substantial endangerment to health or the environment," 42

U.S.C. § 6972(a), does not authorize private parties to recover the costs of past cleanup efforts. Thus, while the plaintiff may seek an injunction directing the defendants to attend to the cleanup and proper disposal of the waste at the Site, the RCRA does not, as he suggests, provide a basis for the recovery of costs he has already incurred.

environmental opinion witness, concludes that the Site "does not appear to present an imminent hazard to human health or the environment...." *See* Exh. 3, attached to the District of Columbia's Renewed Motion for Summary Judgment at 6.

The plaintiff's own consultants, ESC, similarly concluded that "[t]he depth at which the mass of contaminated soil is found, along with the lack of significant levels of metals in the groundwater indicate that the risks to human health and the environment presented by the site appear small and manageable." Exh. 69 to plaintiff's Motion for Partial Summary Judgment, at 47. ESC determined that "the lack of significant levels of lead and mercury in groundwater from outside the Canal area further support the conclusion that this contamination does not present a significant problem." *Id.* at 44.[20] Finally, contrary to the plaintiff's claims regarding the threat of contaminant migration through the aquifer, ESC concluded that the contamination, the majority of which is located at depths greater than 10–15 feet below ground, will not result in human exposure to soil contaminants through contacts, inhalation, or ingestion. "The risks from buried contaminants from their ability to migrate into groundwater ... [but] there is no evidence [that] the contamination is migrating and percolating through the soil, [and] [t]hus the groundwater is not a pathway for exposure to contaminants from the Site." *Id.* at 45. Indeed, the plaintiff acknowledges that the groundwater under the Site is not used for drinking water or other purposes. Joint Statement, ¶ 132. And, when asked whether Riverside had any immediate plans for the Site, Mariani, the former managing general partner testified that he did not "think [they] were ever told that [they] had to immediately go out and start messing with the ground, because as long as things were left quiescent

apparently there was no immediate danger to anybody." Mariani Dep. at 66–67. The plaintiff concedes that Riverside has no current cleanup plans for the Site, and, due to market conditions, there is no active attempt to either market or develop the Site. Joint Statement, ¶¶ 147–48.

In sum, no evidence exists to support the plaintiff's allegation that an imminent and substantial endangerment exists at the Site. While there can be no question that the levels of contamination present at the Site may warrant future response action, the plaintiff cannot establish either a current risk of "substantial or serious" threatened harm, or "some necessity for action." *Price,* 39 F.3d at 1019. *See, e.g., Acme Printing Ink Co. v. Menard,* 870 F.Supp. 1465, 1478–79 (E.D.Wis.1994) (mere presence of hazardous substances at site insufficient to prevail on summary judgment); *Orange Env't, Inc. v. County of Orange,* 860 F.Supp. 1003, 1028–29 (S.D.N.Y.1994) (exceedance of MCL in leachate insufficient to prevail on summary judgment). Rather, the evidence in the record supports a contrary conclusion. Because the plaintiff has thus "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), in that he does not establish that an imminent and substantial endangerment to health or the environment may exist, summary judgment in favor of the defendants with respect to the plaintiff's claims under the RCRA is warranted.

## CONCLUSION

Upon careful consideration of the parties' pleadings, the entire record herein, and the law applicable thereto, the Court shall enter

---

**20.** The PCB sampling conducted by SCS and ESC was not conducted according to EPA protocols, and the lead standard employed (400 ppm) was a screening standard rather than a cleanup standard. Campbell Dep. at 106–09. The SCS study was done not to characterize the Site for cleanup, but for the purpose of attempting to sell an interest in the Site. Mariani Depo. at 139–40. Similarly, ESC's June 1994 "additional site investigation" was not undertaken to characterize the Site for cleanup but as part of an unsuccess-

ful effort to support the plaintiff's theory that munitions manufacturing at the Washington Arsenal during the nineteenth century was the source of contamination found in the area of the James Creek Canal. Haskett Depo. at 1. And in its report summarizing the findings from the June 1994 investigation, ESC concluded that "[t]he field investigation indicates the material used to fill the former canal onsite does not contain residual chemicals from military ordinance." Haskett Dep. at 3.

an Order of even date herewith consistent with the foregoing Memorandum Opinion granting the defendants' Motions for Summary Judgment with respect to the plaintiff's liability under the CERCLA, his claims regarding costs he has incurred in connection with investigating contamination at the Site, and his claims under the RCRA. The Court shall deny the plaintiff's and the defendants' Motions for Summary Judgment regarding their own liability for future response costs under the CERCLA. The Court shall set this matter down for a hearing on the remaining claims, namely, the allocation of liability to the United States for future response costs associated with PCB contamination at the eastern portion of the Site, the potential liability of the United States and the District for future response costs associated with lead and mercury contamination at the western portion of the Site, and the allocation of liability to the plaintiff for contamination at both the eastern and western portions of the Site.