The CRAIG LYLE LIMITED PARTNERSHIP, a Minnesota limited partnership, Plaintiff,

v.

LAND O'LAKES, INC., a Minnesota corporation, Defendant,

v.

HILLCREST DEVELOPMENT, INC., Third–Party Defendant.

Civ. No. 4–93–88.

United States District Court, D. Minnesota, Fourth Division.

Feb. 21, 1995.

Ruth S. Marcott, Seth Marvin Colton, Charles Bans, Maun & Simon, St. Paul, MN, and Philip T. Colton, Maun & Simon, Minneapolis, MN, for plaintiff/third-party defendant.

Linda T. Hatten, Sunday J. Prchal, Doherty Rumble & Butler, St. Paul, MN, Timothy J. Dolan, Steffens Wilkerson & Lang, Edina, MN, Lawrence A.G. Moloney, Doherty Rumble & Butler, Minneapolis, MN, and Mark William Haigh, Davenport Evans Hurwitz & Smith, Sioux Falls, SD, for defendant/third-party plaintiff.

## ORDER

DOTY, District Judge.

This matter is before the court on cross motions for summary judgment. Based on a review of the file, record and proceedings herein, and the reasons stated below, the court denies plaintiff's motion for summary judgment and denies defendant's motion for summary judgment.

## BACKGROUND

This lawsuit involves alleged contamination to certain properties located in northeast Minneapolis, Minnesota. The properties at issue are located at 614 and 640 McKinley Place Northeast and also include one parcel of property, known as "Lot 15," located directly east of McKinley Place. Originally, the properties were owned by defendant Land O'Lakes, Inc. ("Land O'Lakes") from 1949 until December 1982. In 1949, Land O'Lakes located its corporate headquarters on the 614 McKinley Place property and constructed a garage on the 640 McKinley Place property. As part of the garage operation, an underground storage tank ("UST") was installed on the north side of the garage. Lot 15 was used as a fuel station for Land O'Lakes' fleet of trucks. In 1954, Land O'Lakes had installed three petroleum storage tanks on Lot 15. Records indicate that the tanks were removed in September 1969. In 1970, Lot 15 was surfaced for parking, which is its current use.

On December 30, 1982, Hillcrest Development, Inc. ("Hillcrest") purchased the properties from Land O'Lakes. From December 1982 until December 1985, Land O'Lakes leased all of the property, including the service garage, from Hillcrest. From November 1986 to December 1991, Land O'Lakes leased back only a portion of the property. In December 1989, Hillcrest sold both properties to the Craig Lyle Limited Partnership ("Craig Lyle").

Before purchasing the properties, Craig Lyle and Hillcrest conducted environmental audits of the properties. In August 1989, Nova Environmental Services, Inc. ("Nova") performed a "Phase I Environmental Assessment" of the properties. Nova reported the existence of a 120 gallon capacity underground storage tank located on 640 McKinley Place. In November 1989, Twin City Testing Corporation ("TCT") performed a "Phase II Preacquisition Site Assessment" of the properties. TCT conducted seven soil borings to assess potential soil or groundwater contamination. The most significant indica-

tion of contamination came from Boring No. 6, where petroleum odor was detected. Boring No. 6 was located on Lot 15.

On December 13, 1989, a representative of both Hillcrest and Craig Lyle notified the Minnesota Pollution Control Agency ("MPCA") and requested that the MPCA review the Phase II audit and determine whether additional investigation of the contamination was necessary. As a condition of its financing agreements, Craig Lyle was required to remove the underground storage tank located on the 640 McKinley Place property. Craig Lyle also agreed to conduct any tests or do any clean-up work recommended or required by the MPCA. Craig Lyle was also to obtain a letter from the MPCA indicating that no further action was required.

In February 1990, the UST was removed from the 640 McKinley Place property. In the final report regarding the tank removal, dated February 28, 1990, the consultants for Hillcrest and Craig Lyle characterized the leakage of waste oil as relatively minor. In a letter dated September 17, 1990, the MPCA stated that the level of contamination in the area of the UST was minor and no further excavation was warranted.[1] In July 1991, Hillcrest Development, which had provided indemnification for environmental liabilities and incurred the costs of the tank removal north of the service garage, applied for reimbursement from the Minnesota Petroleum Tank Release Compensation Board. The board approved Hillcrest's request in October 1991.

Based on its earlier findings, TCT drilled twelve more soil borings, numbered B–10 through B–21, as part of a "Subsurface Envi-

ronmental Assessment." TCT also installed three temporary monitoring wells ("TMVs") in boring sites B–11, B–17 and B–18 to monitor groundwater. In its assessment report, dated March 30, 1990, TCT stated that significant concentrations of volatile organic compound were discovered in the newer boring sites B–11, B–19, B–20 and B–21.[2] Further, TCT analyzed water samples from the three groundwater monitoring wells. The results indicated that groundwater has been impacted by the contaminates. TCT concluded its report with a discussion of three alternatives including limited soil excavation, continuous groundwater monitoring and groundwater recovery and treatment. In its September 17, 1990 letter, the MPCA stated that no additional investigative or corrective action work for area surrounding Boring no. 6 was necessary.[3]

Craig Lyle originally brought this lawsuit in state court based on claims of nuisance, strict liability, negligence, trespass and environmental tort. After the parties agreed to a stay of the state court proceedings, Craig Lyle filed a new suit in this court under the citizens suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

---

1. The court notes that the MPCA reserved the right to request further action if needed. It also specifically stated that the letter did not relieve any party of liability for this contamination.

2. The most significant concentration of hydrocarbons was detected in Boring No. B–11. This was followed, in descending levels of concentration, by boring nos. B–19, B–21, B–6, B–20 and B–10. Boring sites B–11, B–6 and B–10 were located on Lot 15. The street between Lot 15 and McKinley Place was the location of boring sites B–19, B–20 and B–21.

3. In the letter it stated:

Since the spill associated with Area #2 has affected the ground water in this area, the April 16, 1990, letter requested that a risk assessment be performed to determine whether additional monitoring and/or remedial action is required. A letter submitted to the MPCA dated May 15, 1990, and subsequent data sent to the MPCA on July 20, 1990, by Twin City Testing on behalf of Hillcrest Development determined that the risks associated with the release in Area #2 were minimal and that no additional work was necessary. The MPCA staff concurs with these findings and requests no additional work at this site.

Again, the MPCA reserved its right to require additional work if necessary.

56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

On a motion for summary judgment, the court views the evidence in favor of the non-moving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## I. RCRA

■ RCRA establishes a "cradle-to-grave" regulatory structure for the treatment, storage and disposal of solid and hazardous wastes. The statutory purpose of RCRA is to protect the environment from the dangers associated with solid and hazardous wastes. 42 U.S.C. § 6901(b). Among RCRA's tools for controlling solid and hazardous waste are citizen suits. A citizen suit under 42 U.S.C.

§ 6972(a)(1)(B) permits a plaintiff to bring an action:

> against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

In order to establish a prima facie case, a plaintiff needs to demonstrate: (1) the alleged endangerment stems from a solid or hazardous waste as defined by RCRA, (2) conditions which may present an imminent and substantial endangerment, and (3) the defendant has contributed to or is contributing to such handling, storage, treatment, transportation, or disposal. *See United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1382 n. 9 (8th Cir.1989) (listing elements for prima facia case under 42 U.S.C. § 6973). Land O'Lakes argues that Craig Lyle cannot satisfy any of these elements.

### A. Petroleum, "Solid Waste" and RCRA

■ RCRA defines "solid waste" as:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities ...

42 U.S.C. § 6903(27). RCRA regulations also define solid waste as "any discarded material," and discarded material is defined as material which is "abandoned." 40 C.F.R. § 261.2(a). Materials that are abandoned have been "disposed of." 40 C.F.R. § 261.2(b).[4] The regulatory definition of solid waste falls within Subtitle C of RCRA

---

4. The court notes that the Environmental Protection Agency ("EPA") seems to consider petroleum-contaminated material to be a solid waste. Under EPA regulations, 40 C.F.R. § 261.4(b)(10) excludes generally petroleum-contaminated media from being consider a hazardous waste. The heading of section 261.4(b) is "Solid wastes which are not hazardous wastes."

which addresses hazardous wastes. In subsection 261.1(b)(1), it states that "[t]he definition of solid waste contained in this part applies only to wastes that also are hazardous for purposes of the regulations implementing subtitle C of RCRA." 40 C.F.R. 261.1(b)(1). Further, § 261.1(b)(2) states in part:

> This part identifies only some of the materials which are solid wastes and hazardous wastes under sections 3007, 3013, and 7003 of RCRA. A material which is not defined as a solid waste in this part, or is not a hazardous waste identified or listed in this part, is still a solid waste and a hazardous waste for purposes of these sections if:
>
> .    .    .    .    .
>
> (ii) In the case of section 7003, the statutory elements are established.

40 C.F.R. 261.1(b)(2)(ii) (1994). Courts interpreting this provision have concluded that it applies to citizen suits brought under section 6972(a)(1)(B). *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.,* 989 F.2d 1305, 1315 (2d Cir.1993); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority,* 888 F.2d 180, 187 (1st Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). Thus, the court's inquiry is limited to whether petroleum leaked or spilt from an UST falls within RCRA's statutory definition of "solid waste."[5]

"The starting point in statutory interpretation is 'the language [of the statute] itself.'" *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). The court notes that nowhere does the statute define "discarded material." In *American Min. Congress v. U.S.E.P.A.,* 824 F.2d 1177 (D.C.Cir.1987), the court concluded that in construing the statutory phrase "discarded material" it was "limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away." *Id.* at 1193. Construing the same statutory phrase, the Second Circuit stated that Congress intended to include products within the phrase "discarded material" which no longer serve their intended purpose and which were no longer wanted. *Connecticut Coastal Fisherman,* 989 F.2d at 1314 (quoting H.R.Rep. No. 1491, 94th Cong., 2d Sess. 4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241).

Craig Lyle relies on the decision in *Zands v. Nelson,* 779 F.Supp. 1254 (S.D.Cal.1991), *modified,* 797 F.Supp. 805 (S.D.Cal.1992) to support its argument that spilt or leaked petroleum is actionable under RCRA. *See Paper Recycling, Inc. v. Amoco Oil Co.,* 856 F.Supp. 671, 675 (N.D.Ga.1993) (finding leaked petroleum a solid waste subject to a citizen suit). In *Zands,* landowners sued former landowners and lessees under RCRA for soil contamination caused by petroleum leakage from underground tanks. The court held that under RCRA petroleum leakage constituted a solid waste and was actionable under subsection 6972(a)(1)(B). *Zands,* 779 F.Supp. at 1261–64.

Land O'Lakes argues that definition of "solid waste" is not applicable to gasoline and petroleum because both are useful energy sources.[6] As noted in *Zands,* although pe-

---

**5.** The court finds that there exists a genuine issue of fact on how the contamination occurred on the property at issue. Craig Lyle has steadfastly maintained that the contamination was caused by petroleum from the former USTs on Lot 15. In TCT's March 1990 report, it states that "[t]he distribution of the elevated hNu readings suggests several possible mechanisms for placement. The elevated readings begin in the swamp deposits and topsoil and extend to groundwater, suggesting the possibility of a surface spill prior to the filling and paving of the area." Subsurface Environmental Assessment, p. 3. Land O'Lakes argues that the contamination occurred after the Lot 15 was paved. Land O'Lakes cites a MPCA letter, dated April 16, 1990, in which the MPCA stated that "[apparently] the hydrocarbon release located east of McKinley Place near boring B–6 was a surface spill, possibly an unleaded gasoline spill since methyl tertiary butyl ether (MTBE) was present." However, the court finds the factual dispute irrelevant for the purposes of determining whether RCRA's statutory definition of "solid waste" is satisfied.

**6.** Land O'Lakes also argues that the definition of solid waste is unavailing because it is circular. In *Zands,* the court stated, "For example, a careful reading of the chain of definitions indicates that solid waste is defined as the leaking of any solid waste." 779 F.Supp. at 1262; *see also*

troleum is a useful product, petroleum leaked into soil or groundwater ceases to be useful. The court would add that leaked or spilt petroleum cannot be used for its intended purpose. Moreover, petroleum left behind from commercial operations comports with being abandoned. Accordingly, the court holds that spilt or leaked petroleum resulting from commercial operations satisfies RCRA's definition of "solid waste."

■ Land O'Lakes argues that petroleum releases have traditionally been handled by federal and state regulations particularly tailored to address USTs and associated petroleum spills. 42 U.S.C. § 6991 *et seq.* (Supp.1994); Minn.Stat. § 115C.01 *et seq.* (Supp.1994). Land O'Lakes contends that the *Zands*'s decision should not circumvent the federal and state regulations specifically tailored to address underground tanks and petroleum spills. The court disagrees. Within the citizen suit statutory section, it clearly states the exceptions to a private citizen's right to bring suit pursuant to section (a)(1)(B). 42 U.S.C. § 6972(b)(2). The exceptions recognize that federal and state agencies have enforcement authority, provide for notice to those agencies, and establish when governmental action precludes private lawsuits. *Id.* There is no provision prohibiting citizen suits based on UST petroleum leaks or spills. When Congress explicitly enumerates exceptions to a statutory provision, a court cannot infer additional exceptions without evidence of contrary legislative intent. *See Andrus v. Glover Const. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980). Therefore, the court holds that the existence of federal and state regulations directed at USTs does not prevent a citizen suit action.

## B. Imminent and Substantial Endangerment

■ The second element in plaintiff's prima facie case is whether the waste "may present an imminent and substantial endangerment to health or to the environment." A

finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 465 F.2d 528, 535 (D.C.Cir.1972) (quoting EPA Statement of Reasons Underlying the Registration Decisions). Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose." *United States v. Price,* 688 F.2d 204, 213 (3d Cir.1982) (quoting H.R. Committee Print No. 96–IFC 31, 96th Cong., 1st Sess. at 32 (1979)).

Moreover, a finding that an activity may present an imminent and substantial harm does not require actual harm. *United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir.1984). Courts have also consistently held that "endangerment" means a threatened or potential harm and does not require proof of actual harm. *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1394 (D.N.H.1985); *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870, 885 (E.D.Ark.1980).

■ Land O' Lakes contends Craig Lyle has failed to satisfy this element. According to Land O'Lakes, the experts employed by Hillcrest Development and Craig Lyle and the MPCA agreed that the environmental risks at this location were minimal. Land O'Lakes cites the conclusion reached by the MPCA in its letter dated September 17, 1990 and a letter from TCT, dated May 15, 1990, in which TCT stated that "[t]here have been no reported adverse impacts to our knowledge to date, suggesting that the risks of future impacts should be minimal." Craig Lyle points to the data collected from TMW–1 which indicated the levels of benzene and xylene exceeded the Minnesota Department of Health's recommended allowance levels ("RALs"). Based on the letters written by the plaintiff's experts and the MPCA regarding the risks from the contamination, the

---

*United States v. Self,* 2 F.3d 1071, 1077 n. 3 (10th Cir.1993). The circularity noted in the *Zands* decision derives from utilizing the regulatory definitions of "solid waste" with the statutory defini-

tion of "solid waste." The court notes that the disposal of solid waste is at times distinct from the its creation.

court cannot conclude, as a matter of law, that the property may pose an imminent and substantial endangerment. Therefore, the court denies Craig Lyle's motion for summary judgment. Because the court concludes that there is a genuine issue of material fact at to whether the contaminated property poses an imminent and substantial danger, the court need not reach the question of whether Craig Lyle has satisfied the other element of its prima facie case.

Viewing the facts in the light most favorable to the plaintiff, the court cannot also conclude that the contaminated property, as a matter of law, does not present an imminent and substantial endangerment. Based on the presence of contaminants in the groundwater which exceed the recommended allowable limits, the court is unable to hold that the site currently presents no threat to the environment. Accordingly, the court denies Land O'Lakes' motion for summary judgment.

## D. Abstention

### 1. Primary Jurisdiction

■ Land O'Lakes contends that certain judicial doctrines require the court to abstain from exercising jurisdiction over this action. Initially, the court notes that in litigation under federal statutes, common law doctrines are appropriately applied only when the principles underlying such doctrines are consistent with the congressional intent underlying such statutes. *Petropoulos v. Columbia Gas of Ohio, Inc.*, 840 F.Supp. 511, 515 (S.D.Ohio 1993) (citations omitted).

■ The primary jurisdiction doctrine applies when enforcement of a claim requires the resolution of facts or policies which, under a regulatory scheme, have been placed within the special competence of an administrative body. *American Bakeries Co. v. Pan–O–Gold Baking Co.*, 650 F.Supp. 563, 566–67 (D.Minn.1986). The doctrine serves three main purposes: (1) promotes uniformity of interpretation and results; (2) removes facts outside the conventional experience of judges and places them within the expertise of the agency; and (3) promotes judicial economy by allowing resolution outside the court system. *Id.* When the doctrine ap-

plies, the judicial process should be suspended pending referral of the issues to the administrative body for review.

Land O'Lakes notes that the primary jurisdiction doctrine applies in cases where state agencies are operating pursuant to a federal legislative scheme. *See County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1310 (2d Cir.1990). According to Land O'Lakes, the MPCA has been delegated responsibility for enforcing RCRA. Moreover, Minnesota has been authorized to administer and enforce its hazardous waste program in lieu of subtitle C of RCRA, and Minnesota's hazardous waste laws are incorporated by reference into the federal RCRA regulations. 42 U.S.C. § 6926(b); 40 C.F.R. § 272.1200–01. Land O'Lakes argues that the court should decline to override the decision by the MPCA not to require remedial action. The court disagrees.

■ Applying the primary jurisdiction doctrine in citizen suit actions would greatly reduce the instances in which a plaintiff could pursue a citizen suit action. The court concludes that applying the doctrine would be inconsistent with RCRA's statutory language. As explained previously, Congress has expressly set forth those situations in which a citizen suit under section 6972(a)(1)(B) is precluded. 42 U.S.C. § 6972(b)(2). Those situations include when a plaintiff has failed to notify the EPA Administrator, the appropriate state and the alleged violator, or when the EPA Administrator or state has commenced and is diligently prosecuting a court action. *Id.* Other courts have rejected the doctrine as applying to citizen suit actions. *See Coalition for Health Concern v. LWD, Inc.*, 834 F.Supp. 953, 961–62 (W.D.Ky.1993). Accordingly, the court denies Land O'Lakes' motion for abstention on the grounds of the primary jurisdiction doctrine.

■ Land O'Lakes also argues that Craig Lyle's claims are properly brought in state court based on Minnesota's authorization to enforce its laws regarding hazardous waste in lieu of RCRA Subtitle C. *See Murray v. Bath Iron Works Corp.*, 867 F.Supp. 33, 42–43 (D.Me.1994); *City of Heath v. Ash-*

*land Oil,* 834 F.Supp. 971, 980 (S.D.Ohio 1993); *Thompson v. Thomas,* 680 F.Supp. 1, 3 (D.D.C.1987). However, those courts which have dismissed citizen suit actions where the applicable federal requirements of RCRA have been superseded by an EPA-authorized state hazardous waste program have faced citizen suit actions brought under section 6972(a)(1)(A). For the purposes of determining the effect of an authorized state waste program, other courts do distinguish between citizen suit actions brought under section 6972(a)(1)(B). *See Dague v. City of Burlington,* 935 F.2d 1343, 1353 (2nd Cir. 1991), *rev'd on other grounds, City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Clorox Co. v. Chromium Corp.,* 158 F.R.D. 120, 124 (N.D.Ill.1994). The court concludes that this citizen suit based on section 6972(a)(1)(B) is not superseded by a state program.

### 2. *Burford* Abstention

■ The *Burford* doctrine states that where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. *New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244–45, 47 L.Ed.2d 483 (1976)).

Land O'Lakes cites *Ada–Cascade Watch Co., Inc. v. Cascade Resource Recovery, Inc.,* 720 F.2d 897 (6th Cir.1983) in which the Sixth Circuit abstained under the *Burford* doctrine from deciding whether a hazardous waste facility was "in existence" so as to entitle it to "interim status" under RCRA. Land O'Lakes contends that this court's exercise of jurisdiction would disrupt the state's complex system for regulating USTs and petroleum clean-up. The court disagrees.

■ As explained previously, Congress has granted jurisdiction to federal courts to decide citizen suit actions and has set forth those situations in which a citizen suit under section 6972(a)(1)(B) is precluded. 42 U.S.C. § 6972(b)(2). In *New Orleans,* the Supreme Court stated that "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." 491 U.S. at 362, 109 S.Ct. at 2515 (citation omitted). Here, Congress has found the problems of solid and hazardous waste to be national as opposed to only an "essentially local problem." Accordingly, the court denies Land O'Lakes motion for abstention on the grounds of the *Burford* doctrine.

## II.  STATE LAW CLAIMS

### A.  Pendent Jurisdiction

■ Under the doctrine of pendent jurisdiction as stated in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), a federal court has the power to assume jurisdiction over state law claims when both the "state and federal claims ... derive from a common nucleus of operative fact." *Id.* at 725, 86 S.Ct. at 1138. Craig Lyle filed this lawsuit in federal court after the parties agreed to a stay of the state court proceedings. Craig Lyle argues that its state law claims should be severed and returned to state court. Land O'Lakes seeks to have one court decide the issues raised in Craig Lyle's complaint. The power to exercise jurisdiction "need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139. When "it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *United Mine Work-*

*ers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The test articulated in *Gibbs* has been codified in 28 U.S.C. § 1367(c).[7]

It is clear from Craig Lyle's complaint that its state law claims predominate over the RCRA claim. Craig Lyle has asserted claims of trespass, negligence, nuisance, strict liability and environmental tort. Those state law claims involve issues triable to a jury and are subject to various state law defenses. If Craig Lyle were successful on those state claims, it would be entitled to compensatory damages. However, under RCRA, Craig Lyle would only be entitled to injunctive relief. Damages are not available under RCRA. *See Kaufman & Broad–South Bay v. Unisys Corp.,* 822 F.Supp. 1468, 1476–77 (N.D.Cal.1993); *Gache v. Town of Harrison, N.Y.,* 813 F.Supp. 1037, 1045 (S.D.N.Y.1993); *Commerce Holding Co., Inc. v. Buckstone,* 749 F.Supp. 441, 445 (E.D.N.Y. 1990). Craig Lyle's state law claims also raise unsettled issues of state law that are more properly addressed in state courts. Other courts have declined to exercise pendent or supplemental jurisdiction over similar state law claims when they have predominated over a plaintiff's federal claim. *See Town of Jaffrey v. Town of Fitzwilliam,* 846 F.Supp. 3 (D.N.H.1994); *Dublin Scarboro Improvement Ass'n v. Harford County, Md.,* 678 F.Supp. 129 (D.Md.1988). Considering the state court proceeding has been stayed, the court finds that the parties will not suffer any prejudice. Accordingly, the court dismisses without prejudice Craig Lyle's state law claims.

### CONCLUSION

Based on a review of the record, file and proceedings, and the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment is denied;

2. Defendant's motion for summary judgment is denied;

3. Plaintiff's state law claims are dismissed without prejudice.

---

7. 28 U.S.C. § 1367(c) states:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.