**Jerry DAVIES; Diane Davies; and Davies Communications, Inc., Plaintiffs,**

v.

**NATIONAL COOPERATIVE REFINERY ASSOCIATION and Coastal Refining & Marketing, Inc., Defendants.**

**No. 96–1124–WEB.**

United States District Court, D. Kansas.

March 20, 1997.

---

**2.** Of course, the ALJ did not have this statement when he rendered his decision.

Charles Steincamp, Randall Rathbun, Wichita, KS, for plaintiffs.

John Wachtel, Mary Malicoat, Wichita, KS, for NCRA.

Joseph Kennedy, Robert Coykendall, Wichita, KS, for Coastal.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This dispute arises out of the contamination of groundwater underlying plaintiffs, real property near McPherson, Kansas. Count I of the complaint alleges a claim under the Resource Conservation alleges pendent state law claims. The matter is now before the court on summary judgment motions filed by the National Cooperative Refinery Association ("NCRA") (Doc. 73) and Coastal Refining & Marketing, Inc. ("Coastal") (Doc. 76).

*Facts.*

For purposes of summary judgment, the court finds no genuine dispute as to the following facts.

1. Davies Communications, Inc., is the owner of certain real property in the Southeast Quarter of Section 5, Township 10 South, Range 3 West of the 6th Principal Meridian, McPherson County, Kansas (hereinafter "the radio station property" or "the real property"). The property is used to operate a radio station. Located on the property are a broadcast tower, studio, and office building, all of which are owned by Davies Communications, Inc. The individual plaintiffs, Jerry and Diane Davies, are officers and shareholders of the company.

2. The radio station property is about a mile and a half south of McPherson, Kansas. The area immediately around the station has been a center for refining and handling of petroleum products for many years. A National Coop Refinery Association (NCRA) refinery and storage facilities are located west, northwest, and directly north of plaintiffs' property. To the north and east of plaintiffs' property are storage and distribution facilities for KANEB Pipeline Company and CENEX. Directly to the south is an abandoned distribution terminal that was once operated by Derby Refining Company, a predecessor of defendant Coastal. Coastal now owns the property. The area around the radio station

also includes numerous pipelines. (Coastal Exh. 1 at 1).

3. In 1968, Robert B. Hapgood was employed by the radio stations which are now owned by plaintiff Davies. As early as 1968, Mr. Hapgood and other employees were aware of the presence of hydrocarbons in the radio stations' water. Employees could smell the hydrocarbons in the water and could see a sheen on top of it. They joked that you should not throw cigarettes in the toilet or the radio station might blow up. (Coastal Exh. 2).

4. In 1978, groundwater contamination was found in a well on the Larry Weibert property to the east and north of the Derby tank farm. As a result, NCRA drilled Weibert a new uncontaminated well on November 16, 1978, that was 165 feet deep. (Coastal Uncontroverted Fact # 3).

5. In early November of 1984, Joe Engle, the manager and part-owner of the radio station, complained to the Salina District Office of the Kansas Department of Health and Environment (KDHE) about the presence of gasoline in the water well at the station. (Coastal Exh. 6). A sample from the well was obtained by KDHE and tested; it showed the presence of gasoline. (Coastal Uncontroverted Fact # 4).

6. On December 18, 1984, NCRA drilled a new water well for the radio station. (Id). The newer well is located seventy-five feet north of the old well and is deeper than the old well. A water sample collected from the new well on December 27, 1984, was tested by KDHE and showed no petroleum hydrocarbons or gasoline. The original well was retained for future use as an observation well by KDHE and Bengel Broadcasting. (NCRA Uncontroverted Fact # 7).

7. On October 1, 1985, Davies Communications, Inc., purchased the radio station from Bengel Broadcasting. (Coastal Exh. 14). Prior to the purchase, plaintiffs were informed by Joe Engle that NCRA had recently drilled them a new water well because the old well had "gone bad."[1] (Coastal Uncontroverted Fact # 7).

8. After the discovery of groundwater contamination beneath the radio station, NCRA discovered petroleum hydrocarbon contamination beneath its own property.

9. Since the 1980s, NCRA has operated a containment-recovery system under its refinery north and west of the radio station to recover lost free-phase product and to remediate groundwater contamination at the site. This recovery system includes pumping large volumes of groundwater to create a cone of depression which causes floating free-phase petroleum to concentrate at the lowest areas where it is recovered. The drawdown cone extends southward from NCBA' 5 refinery and includes the areas under the radio station and the Coastal property. Petroleum products under the Coastal and radio station properties are being drawn into this cone. (Coastal Uncontroverted Fact # 12).

10. On October 26, 1988, NCRA and the KDHE entered into a settlement agreement pursuant to which NCRA agreed to take certain steps to investigate and monitor the pollution, to continue NCRA's operation of a groundwater/hydrocarbon recovery system, and to submit annual reports relating to the site. (NCRA Exhs. F & G). The agreement further provided that it represented KDHE's professional judgment based upon currently available information and that if circumstances changed or if data indicated an imminent threat of danger to public health or the environment, then KDHE retained the right to modify or add to the requirements of the agreement. (NCRA Exh. G at 6.)

11. Derby acquired part of the Southeast Quarter of Section 5, Township 20 South, Range 3 West in McPherson County, Kansas, in October, 1947. Derby operated a products terminal and truck loading facility on that

---

1. Engle testified in his deposition that he told the Davies that the groundwater under the station was contaminated with gasoline but that he believed the problem of drinking water was solved by the drilling of the new well. Plaintiffs deny that Engle told them anything more than the old well had "gone bad" and that a new one had been drilled by NCRA. Plaintiffs also deny that Bengel's records, which included correspondence relating to the gasoline contamination, were available to them prior to the purchase. Because the matter is before the court on summary judgment, the court assumes the truth of plaintiffs' version of events.

property (located approximately one and one-half miles south of McPherson, Kansas) from the late 1940's until the summer of 1982. At that time operations ceased and the property was vacated. (Coastal Uncontroverted Fact # 13).

12. The terminal was connected to the Derby Refinery in Wichita, Kansas, by a four-inch products pipeline which delivered refined products such as gasoline and diesel fuel to the terminal. At the terminal the products were stored in above-ground tanks until being piped to a truck-loading rack to load trucks as needed. (*Id.* # 14). In May, 1983, the Derby property was sold to Roman, Inc., under a contract of sale with a deed to the property being placed in escrow. In February, 1986, Roman defaulted on the contract of sale and in December, 1989, Coastal received back from the escrow holder the deed to the property. It is Coastal's information and belief that Roman never conducted operations on the property. In July, 1994, Coastal quieted title to the property but never resumed operations there. (*Id.* # 15).

13. During the time that Derby operated the terminal, truck drivers would sometimes clean out their trucks and dump hydrocarbon products on the ground at the terminal. At times, hydrocarbon products spilled over as the trucks were being loaded because the driver left the truck unattended. Also, the four-inch pipeline that ran from the Derby Refinery in Wichita to the McPherson terminal had leaks in it from time to time around the terminal facility grounds. (*Id.* # 16).

14. On or about March 2, 1973, a diesel oil spill of 100 to 150 gallons occurred when a tank truck inadvertently overflowed during a loading operation. (*Id.* # 17).

15. At the time in 1984 when the radio station's well was replaced, Derby had sold the property to Roman, Inc., which had not yet defaulted on the contract. (*Id.* # 18).

16. The KDHE has general jurisdiction of matters involving hazardous substance cleanups pursuant to the Kansas Environmental Response Act. K.S.A. 65–3452a, et seq. The KDHE also has general jurisdiction over hazardous waste and its cleanup (K.S.A. 65–3430, et seq.) and has general authority and responsibility to protect the soils and waters of the state under K.S.A. 65–161, et seq.

17. As part of KDHE's efforts to investigate the presence of contamination beneath the radio station property and beneath other property in the south McPherson, Kansas, area, the KDHE retained PRC Environmental Management, Inc., to conduct both a final site assessment and a Comprehensive Investigation. (NCRA Uncontroverted Fact # 23). On October 28, 1993, as part of the site assessment, an employee of PRC went to the radio station and sampled the water in the old shallow well that had been abandoned in 1984 because it was contaminated. When test results showed the presence of benzene at levels of 10.2 parts per billion in the water sample, KDHE assumed that the sample came from the new deep well which was being used as a source of domestic water supply at the station. On October 28, 1993, KDHE notified the plaintiffs of the results of the tests and advised plaintiffs to use water from another source for domestic consumption. (*Id.* # # 23, 25; Coastal Uncontroverted Fact # 20).

18. Plaintiffs have never used water from the old contaminated well on their property. They and the employees at the radio station have been using water from the new replacement well from 1984 until October, 1993. When Davies was told by KDHE to shut the water down because it contained cancer-causing agents, he was shocked and immediately shut down the water. Since that time the station has not used water from the newer well except for the toilet. (Coastal Uncontroverted Fact # 21).

19. On August 24, 1994, PRC issued a Final Site Assessment Report. (Coastal Exh. 19). The purpose of a site assessment is to collect and review all available information about the site and to make a recommendation as to whether additional work at the site is required. *Id.* at 1. Tasks performed during a site assessment include: identifying the location of all water wells and drinking water supplies in the vicinity of the site; identifying and determining the location of potential sources of contamination if found or

if known to be present; determining migration pathways, including the groundwater flow direction; identifying potential human and environmental targets; collecting samples to confirm the presence of contamination; and determining the need to obtain more information through follow-up work at the site. *Id.*

20. The site assessment noted that a KDHE monitoring well had been installed on the Butterfield property (just northeast of the radio station property and just south of the KANEB tank farm) in December of 1990, and samples from that well showed the presence of Benzene, Toluene, Ethylbenzene, and Xylenes (BTEX), ethylene dibromide, and 1,2–Dichloroethane (1,2–DCA). The report identified the groundwater flow at the site as being to the north-northwest in December of 1993. Four potential sources of contamination within four miles of the site were identified: the NCRA refinery, the KANEB pipeline and tank farm, the CENEX tank farm, and the abandoned Derby tank farm. A well survey indicated that, among others, there are 139 domestic wells, 26 irrigations wells, 4 public water supply wells, and 139 monitoring wells within four miles of the site. The NCRA refinery owns 81 of the 139 monitoring wells. Four private water wells are located within one mile of the site.

21. The site assessment concluded that there is a groundwater contamination problem at the site. BTEX compounds, gasoline, and diesel fuel were detected in the KDHE monitoring well in concentrations above maximum contaminant levels (MCL's). The report further concluded that there is a potential impact from the site on human and environmental targets and recommended that a comprehensive investigation be scheduled for the site. The report also observed:

> Significant contamination has been observed in the groundwater at the South McPherson site. The wells in the area are screened in the Equus Beds aquifer, which is a locally and regionally important aquifer. This aquifer supplies drinking water to the city of McPherson and all or most of the outlying rural homes. Further south, wells for the city of Wichita are also

> screened in this aquifer to supply drinking water for residents of that city.

*Id.* at 24. As a result, PRC recommended that a groundwater investigation be conducted to determine the sources of contamination and that the soil be tested to assist in defining the extent and source of contamination. *Id.* After defining the probable extent of contamination, the report stated, monitoring wells could be installed to obtain representative samples of groundwater and to fully determine the impact of contamination on the local groundwater supply. *Id.*

22. On September 21, 1994, Thomas Waller of KDHE wrote to Jerry Davies and again told him that the radio station well was contaminated and they should not drink the water. He sent a copy of the test results showing 10.2 parts per billion of benzene. As is indicated above, these test results were based on a sample from the old well that was not being used by plaintiffs. (Coastal Uncontroverted Fact # 22).

23. On November 29, 1994, the water in the new deep well at the radio station was tested and no hydrocarbons were detected. On January 9, 1996, the new well was again tested and showed no hydrocarbons.

24. In 1993, KDHE contacted Coastal to seek permission for access to the terminal property. Coastal cooperated with KDHE, gave them access and since that time has continued to cooperate with KDHE to further investigate the situation. On August 16, 1996, Coastal entered into a Consent Order with KDHE which obligates Coastal to continue the investigation of the contaminated groundwater in the area of the abandoned terminal and to conduct additional work at the site as requested by the KDHE. Coastal, in compliance with the Consent Order, has drilled and tested seven more monitoring wells and has proposed and is ready to do more as soon as KDHE gives its approval.

25. The Environmental Protection Agency has not placed the south McPherson site on the National Priority List.

26. PRC undertook a comprehensive investigation and on September 28, 1995, issued a Phase I Interim Report. (Coastal Exh. 25). The purpose of a comprehensive

investigation (CI) is to identify potential sources, extent, and potential receptors of groundwater plume contamination. *Id.* at 1. The CI at the south McPherson site was conducted in a phased approach. Phase I included soil sampling and analysis, monitoring well drilling and construction, groundwater sampling and analysis, data evaluation, and preparation of the Phase I report. The Phase I activities involved three field investigations: August of 1994, November–December, 1994, and March, 1995. As part of Phase I, ten new monitoring wells were installed. Groundwater samples were taken from these monitoring wells and from eleven other wells, including the newer well on the radio station property.

27. Soil samples analyzed by PRC detected widespread soil contamination at the former Derby tank farm. Free-phase petroleum at an estimated thickness of 1.88 feet was found at monitoring well MW–3 immediately west of the Derby site. Based upon samples from the various wells tested, PRO prepared isometric maps showing the estimated area and concentrations of groundwater contamination. PRO found that the contaminants of concern in groundwater at the south McPherson site are free-phase petroleum; BTEX, VPH (volatile petroleum hydrocarbon) and SVPH (semivolatile petroleum hydrocarbon) compounds; 1,2–DCA; and lead. Based on its sampling results, PRO found that the known lateral extent of the free-phase petroleum was limited to the area near the Derby tank farm.

28. PRO made numerous findings and recommendations as part of its report. Based on the groundwater contamination in the area, it stated that all potential human receptors of groundwater should use other sources of water. It concluded from the sampling results that there are two large areas of BTEX, VPH, and SVPH soil and groundwater contamination at the south McPherson site: one area surrounding the former Derby tank farm and a second area at the KANEB tank farm. The area of contamination in and around the Derby tank farm was said to be well-defined. The probable sources of contamination include releases from the Derby tanks, two releases during

truck refilling, and possible releases from a removed Derby pipeline south of the area. PRO believes the free-phase petroleum found in MW–3 is a continuing source of dissolved-phase BTEX compounds and other constituents into the groundwater and should be further delineated with the installation of additional monitoring wells. After the free-phase plume is adequately delineated, PRO stated, it should be removed to ensure that additional releases do not occur. PRC noted that remediation of high levels of petroleum hydrocarbon contamination would eliminate a continuing source of groundwater contamination and that possible remedial alternatives include soil vapor extraction or bioremediation. PRC recommended the installation of seven additional monitoring wells at various locations to further define the extent of contamination, to provide groundwater flow information, and to identify the plume source at the KANEB tank farm. PRC recommended additional Phase II activities to further delineate the horizontal and vertical groundwater contamination.

29. PRC had quality-control problems in conducting their investigation and running field tests in their mobile laboratory. Therefore, their results may be suspect and are not determinative. (Coastal Uncontroverted Fact # 26).

30. The plaintiff's retained expert, Duane L. Winegardner, P.E., has expressed the opinion that the primary source of the groundwater contamination beneath plaintiffs' property is the Derby tank farm. (NCRA Uncontroverted Fact # 39).

31. Winegardner's expert opinions also included the following: groundwater flow at the radio station is to the north, caused by pumping of the aquifer by NCRA and other groundwater users; petroleum products in the soil are a continuing source of aquifer contamination; the free-phase gasoline in KDHE MW–3 is a continuing source of groundwater contamination; fuel products in the soil under the Derby tank farm originated at the surface and migrated downward to contaminate the aquifer; the contamination of the aquifer was caused by a long-term release; natural degradation is not an effective remediation procedure; and restoration

of the aquifer under the radio station to pre-contamination conditions by current viable technology will be very difficult, if not impossible.

32. In response to the defendants' motions for summary judgment, plaintiff also submitted an "amended report" from Mr. Winegardner in which he further clarifies his opinion that NCRA's pumping of the aquifer has changed the natural direction of groundwater flow at the Davies' site as well as the rate of flow. (Pl. Exh. G, Winegardner affidavit) He believes that to the extent groundwater moved at all prior to NCRA's pumping of the aquifer, it probably flowed to the north-northwest at a very low rate of flow. As aquifer usage increased, it affected the groundwater flow direction. When the groundwater flow direction was toward the northwest, Winegardner asserts, groundwater contamination from the Derby site migrated in that direction, generally away from the Davies' well. When the flow direction was changed by NCRA, he believes, the contaminated groundwater flowed directly toward the Davies' well. He contends that a major factor in the directional change appears to have occurred after 1974 when NCRA changed their well-pumping plan and started using new production wells, including one close to the Davies' property. It is Winegardner's opinion that the alteration of the groundwater pumping programs by NCRA changed the groundwater flow direction from northwest to north and dramatically increased the rate of flow from virtually no groundwater movement in the 1940s to 37 feet per year at present.

33. Also included in the amended report is a risk analysis to evaluate the human health risk due to exposure to benzene con-tained in groundwater from the old and the new wells on the radio station property. Using a model developed by the American Petroleum Institute and based upon the assumptions stated in his amended report, Winegardner calculated the carcinogenic health risk to individuals exposed to water from the old and new wells, respectively, to be 650 and 219 times greater than acceptable.

34. The amended report also contains Winegardner's opinion "that the contamination present in the aquifer constitutes an imminent and substantial endangerment to both human health and the environment." He asserts that the Equus beds aquifer "is one of the most important natural resources in the state and is used by over 530,000 people" and that "the investigatory work completed to date around the radio station and Coastal sites has demonstrated a significant endangerment to the aquifer and thus to users of that water source."

*Discussion.*

Count I of the complaint alleges a claim under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B). Subject to certain exceptions, that section authorizes suit in federal district court against any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste "which may present an imminent and substantial endangerment to health or the environment ...." [2] § 6972(a)(1)(B). If such a condition is shown to exist, the court may order the person to "take such action as may be necessary." § 6972(a). Defendants move for summary judgment on several grounds, one of which is

---

**2.** As the court discussed in denying defendants' motions to dismiss on the pleadings, the requirement of an "endangerment" suggests there must be a condition that creates an unreasonable risk of harm to human health or of harm to the environment. *cf.* Webster's Third New Int'l. Dictionary 748 (1961) (defining "endanger" as "2: to bring into danger or peril of probable harm or loss...") *See also Foster v. United States,* 922 F.Supp. 642, 661 (D.D.C.1996) (Imminent and substantial endangerment exists if there is "reasonable cause for concern that someone or something may be exposed to a risk of harm ... if remedial action is not taken.") The endanger-ment must be "substantial," which suggests that an exceedingly low risk of harm or a risk of only minor harm will not support an action. The endangerment must also be "imminent," which means that it threatens to occur immediately. *Meghrig v. KFC Western, Inc.,* — U.S. —, —, 116 S.Ct. 1251, 1255–56, 134 L.Ed.2d 121, 128 (1996). The reference to waste which "may present" imminent harm excludes waste that no longer presents such a danger and "implies that there must be a threat which is present *now,* although the impact of the threat may not be felt until later." *Id.* (quoting *Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir.1994)).

that the court should abstain from exercising jurisdiction over this claim in view of the involvement of the KDHE at the south McPherson site. Because the court finds this argument persuasive, defendants' remaining arguments for summary judgment will not be addressed.

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to· interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

### Primary Jurisdiction and Abstention.

In denying the defendants' motions to dismiss on the pleadings in this case, the court noted the split of authority as to whether primary jurisdiction and abstention are appropriate in a RCRA citizen suit. *See Coalition for Health Concern v. LWD, Inc.,* 60 F.3d 1188, 1193 (6th Cir.1995) (abstention appropriate); *Space Age Fuels, Inc. v. Standard Oil Co. of California,* 1996 WL 160741 (D.Or., Feb. 29, 1996) (same); *Friends of Santa Fe County v. LAC Minerals, Inc.,* 892 F.Supp. 1333 (D.N.M.1995) (same); *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.,* 877 F.Supp. 476 (D.Minn.1995) (abstention inappropriate); *Prisco v. New York,* 1992 WL 88165 (S.D.N.Y., Apr. 22, 1992) (inappropriate); *Middlesex County Bd. of Chosen Freeholders v. State of New Jersey,* 645 F.Supp. 715 (D.N.J.1986) (inappropriate). The court also observed that when Congress has set forth the conditions under which state or administrative action will preclude a federal claim, as it did in § 6972(a)(1)(B), a federal district court must be cautious about refusing to exercise jurisdiction when those conditions are not present lest it frustrate Congress' scheme for vindicating important federal interests. Despite these concerns,

the court is convinced that abstention is appropriate in this case.

■ "The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). It "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Williams Pipe Line Co. v. Empire Gas Corp.,* 76 F.3d 1491, 1496 (10th Cir. 1996).

In *Friends of Santa Fe County v. LAC Minerals, Inc.,* 892 F.Supp. 1333 (D.N.M. 1995), the court set forth the factors that a court should examine when considering the doctrine of primary jurisdiction. First, the court should consider whether it is being called upon to decide factual issues not within the conventional experience of judges or whether the issues are of the sort that a court routinely considers. *Id.* at 1349. There can be no question that plaintiffs' RCRA claim raises issues that are within the special expertise of the KDHE. The primary issues under that claim concern the extent of the threat posed by the hazardous waste, whether immediate remediation is required to protect health or the environment, and what type of remedy is best suited to the site. These are all matters within the specialized knowledge of the agency, which is charged by state law with responsibility for investigating hazardous waste problems in Kansas and for protecting human health and the environment.[3] Although RCRA clearly contemplates federal judicial intervention in such matters, in this case the court's involvement would likely cause further delay of the investigation of the site and, in view of KDHE's extensive involvement, would result in a substantial duplication of effort. Moreover, such intervention has not been shown

---

**3.** Under K.S.A. § 65–3445, the secretary of Health and Environment, upon receipt of information that the disposal of any hazardous waste may present a substantial hazard to the health of

persons or to the environment, may take such action as may be necessary to protect the health of persons or the environment.

to be necessary at this time to protect health or the environment.

The court should also consider whether the defendants could be subjected to conflicting orders of both the court and the administrative agency. *Friends of Santa Fe County,* 892 F.Supp. at 1350. A potential for conflicting orders would exist if this court were to determine an investigatory and remediation plan independently of the KDHE. For example, plaintiffs argue that NCRA is subject to a remediation order under § 6972 because its pumping of the aquifer is causing hazardous waste from the Coastal property to migrate into the aquifer under plaintiffs' property. NCRA's pumping of the aquifer, however, is clearly a remedial measure that was designed to recover hydrocarbons by drawing them into the cone of depression created by the pumping and, in fact, NCRA agreed to continue to do this as part of its settlement agreement with the KDHE.

■ A third factor to be considered is whether relevant agency proceedings have actually been initiated. Here, KDHE and the defendants have entered into consent orders pursuant to which defendants are obligated to cooperate with KDHE in investigating and remediating [4] the potential threat to health and the environment from the contamination at the site. "It is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency." *Friends of Santa Fe County,* 892 F.Supp. at 1350 (quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 420 (5th Cir.1976)).

Fourth, courts consider whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to languish. This factor does not necessarily weigh in favor of primary jurisdiction, given that KDHE has been involved at the site since 1984 and still has no definitive plan for remediation. Despite this, the court concludes that it should abstain to permit the agency a further period in which to pursue remediation. One reason for doing so is that after a rather slow start, the KDHE investigation has been more diligently conducted since 1995 and appears now to be on the verge of addressing remediation. A second reason for allowing further time is that, by plaintiffs' own admission, restoration of the aquifer to pre-contamination conditions by current viable technology "will be very difficult, if not impossible." And third, plaintiffs have produced no evidence that human health or the environment will be subjected to imminent danger in the interim if the court declines jurisdiction to permit the agency to develop its own remedial plan. Thus, plaintiffs have not shown a real imperative for this court to act as opposed to letting the agency complete its investigation and direct the remediation.

Finally, the court should consider the type of relief requested. The courts routinely evaluate claims for damages, but the doctrine of primary jurisdiction is more readily applied to claims for injunctive relief requiring scientific or technical expertise. This factor weighs in favor of administrative resolution because the injunctive relief sought requires evaluation of a complex scientific matter that is within the special expertise of the KDHE.

In addition to the principles behind primary jurisdiction, the court has considered the "Burford" abstention doctrine, which holds that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disrup-

---

4. Plaintiffs argue that Coastal's consent agreement only requires it to investigate the site and not to cooperate in remediation. In its motion for summary judgment, Coastal represents the following: "KDHE and Coastal are proceeding in accordance with the Consent Agreement which obligates Coastal to determine the source of the pollution under its property, and the area being tested, and to take whatever appropriate remedial steps KDHE determines to be necessary." *Coastal Mem.* at 16, # 2. The court understands this representation to mean that Coastal is agreeing to take appropriate remedial actions directed by KDHE if the investigation shows that Coastal is responsible for the contaminants.

tive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Public Service, Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989).

Largely for the reasons expressed above, review by this court of the issues involved in investigating and determining an appropriate remedy would undercut efforts by the state of Kansas to establish a coherent policy concerning remediation of hazardous wastes.

■ After carefully considering these doctrines and the facts of the case, the court concludes that it should abstain from exercising jurisdiction under RCRA in order to permit the KDHE to continue its investigation, supervision, and remediation of the site without the prospect of conflicting directives from this court as to how the contamination should be remedied.

Because the court abstains, it need not determine whether plaintiffs' evidence would survive summary judgment on the question of "imminent and substantial endangerment" under § 6972. Still, in deciding to abstain the court has considered the nature of the threat posed by the contamination. For purposes of summary judgment, the court accepts as true the analysis of plaintiff's expert that the carcinogenic health risk to individuals exposed to benzene in water from plaintiffs' older and newer wells is, respectively, 650 and 219 times greater than acceptable. Although this clearly suggests that the resulting threat from exposure to this groundwater would be substantial, it does not establish or address the likelihood that any person will actually be exposed to it. Here, plaintiffs have been warned of the danger and are able to occupy the property without serious risk to their health by using an alternative water supply. In making this observation, the court does not mean to suggest that an endangerment to health cannot-be considered imminent whenever the plaintiff has a means of avoiding the hazard. The threat of exposure can always be avoided by evacuating property where hazardous waste is found or by taking other extraordinary measures. *See e.g., Morris v. Primetime Stores of Kansas, Inc.,* 1996 WL 563845 (D.Kan. Sept. 5, 1996) (plaintiffs moved out of their house because of the presence of explosive vapors). In contrast to the situation in Morris, the plaintiffs here are able to occupy the property and can operate the radio station without a threat to their health. The fact that they must use bottled water instead of groundwater is undoubtedly an inconvenience and an economic burden, but it is the type of injury for which an action at law provides an adequate remedy.

Nor have plaintiffs shown that any other persons might be exposed to or ingest the contaminated groundwater if the court fails to order immediate remedial action. Although plaintiffs repeatedly cite the fact that public water supply wells for McPherson and Wichita are screened in the Equus Beds aquifer, they cite no evidence to show that the contamination at the south McPherson site poses an imminent endangerment to these wells. Indeed, the evidence presented suggests otherwise. It is undisputed that petroleum products under the Coastal and radio station properties are being drawn into the cone of depression caused by NCRA's operation of its containment/recovery system. No facts have been cited to show that the plume of groundwater contamination at the site is expanding beyond the cone of depression. Moreover, plaintiff's expert estimates that the groundwater flow at the site is approximately 37 feet per year, at which rate it would apparently not reach the city of McPherson's supply well (located over one mile away) for over one hundred years. Thus, there is no evidence that an imminent danger to the health of any person will arise if the court abstains to permit KDHE to pursue the investigation and remediation of the site. The same is true of the threat to the environment. Clearly, a portion of the aquifer in the south McPherson area has been contaminated for almost twenty years and, by all accounts, will remain contaminated for some time to come regardless of whether remedial action is undertaken immediately. The evidence is noticeably lacking, however, concerning the present or future threat of further damage to the environment from the existing soil and groundwater contamination. Plaintiffs cite no specific facts to

show the likelihood that the pollution will migrate to new areas or that there is a substantial and imminent threat to uncontaminated areas of the aquifer.[5]

*Conclusion.*

The KDHE has conducted an extensive investigation of the site and is seeking to determine the best methods for remediation of the contamination. For the reasons set forth above, the court finds that the KDHE should continue the investigation and that it should diligently develop a remedial plan. Accordingly, the court abstains from exercising jurisdiction over Count I of the complaint, which contains plaintiffs' claim for equitable relief under § 6972(a)(1)(B). The court also declines to exercise supplemental jurisdiction over the remaining state law damage claims set forth in Count II. See 28 U.S.C. § 1367(c)(3).

The defendants' motions for summary judgment (Docs. 73 & 76) are GRANTED and the complaint is hereby DISMISSED without prejudice.

---

**5.** Plaintiff's expert opines that "[t]he Equus Beds aquifer is ... used by many residents in the area" and that "the investigatory work completed to-date ... has demonstrated a significant endangerment to the aquifer and thus to users of that water source." This assertion is conclusory, however; it appears to assume a likelihood that the hazardous waste will migrate to other areas of the aquifer, but does not disclose the factual basis, if any, for that assumption.